Sheila SEATS, Plaintiff–Appellee,

v.

Kermit LOWRY, M.D., Defendant–Appellant.

Court of Appeals of Tennessee, Eastern Section.

March 28, 1996.

Permission to Appeal Denied by Supreme Court Sept. 9, 1996.

Richard M. Currie, Jr., Kingsport, for Defendant–Appellant.

John S. Bingham, Daniel B. Minor, Kingsport, for Plaintiff–Appellee.

## OPINION

GODDARD, Presiding Judge.

Kermit Lowry appeals a medical malpractice judgment rendered against him in the amount of $65,000 in favor of Sheila Seats. He insists on appeal that the Trial Court was in error in not directing a verdict in his favor at the conclusion of all the proof and in refusing to charge the jury certain of his special requests.

On January 24, 1991, Dr. Lowry performed surgery on Ms. Seats, who had previously undergone a hysterectomy to remove her tubes and ovaries. During the course of this operation Ms. Seats' ureter was injured by Dr. Lowry suturing the ureter or the ureter wall. As a result it was necessary for Ms. Seats to undergo considerable medical procedures and to incur considerable medical expenses.

In our review of the first issue relative to a directed verdict we are required to take the strongest legitimate view of the evidence in favor of Ms. Seats and allow all reasonable inferences to be drawn therefrom, as well as to discard all countervailing evidence. *Benton v. Snyder,* 825 S.W.2d 409 (Tenn.1992); *Sauls v. Evans,* 635 S.W.2d 377 (Tenn.1982).

Although there is testimony to the contrary, Dr. Monte W. Phillips, the expert who appeared for Ms. Seats, testified, among other things, the following:

Q   Have you reviewed the records in this case?

A   Yes, I have.

Q   Did you come to the conclusion that Dr. Kermit Lowry deviated from the recognized standards of acceptable professional practice—

A   Yes, I did.

Q   —in the specialty of general surgery in Bristol, Tennessee, or a similar community?

A   Yes.

. . . .

Q   Dr. Phillips, as you know and as the ladies and gentlemen of the jury have been told, Sheila Seats had a hysterectomy approximately two years prior to the surgery to remove her ovaries. How does this affect the inside anatomy of a person, and in particular, based on your review of the records, how did it affect Sheila Seats?

A   All right. You can do a hysterectomy and two years later you can, for some reason or another have to re-enter that abdomen and go back in there and find a few adhesions and very little change. Very often, however, and I mean very often, when someone has had a hysterectomy, especially at age 28, you presume it was for some disease process, and you re-enter the pelvis for any other reason, very frequently you find your ovaries and the fallopian tubes attached to the peritoneal wall, pulled down out of their normal position. And when they are multicystic or polycystic, you see all kinds of wild and almost, to me, ununderstandable situations.

I have personally taken the ureter out of the center of an ovary in a bad cystic affair where way [1] the ureter got right out in the center running through the middle of the ovary. I've done that several times.

Q   Is this something that a reasonable and competent surgeon should anticipate?

A   Flat out yes.

1. These words—"where way"—are as they appear in the transcript.

. . . .

Q Does the standard of care, tell me whether or not in your opinion the standard of care requires the surgeon to anticipate that the ureter itself may be adhered to other structures or itself may not be in its normal location?

A Absolutely. Flat out yes.

Q Tell me whether or not—

A Let me dispel something. A surgeon is a little bit more than a mechanic. He's also a doctor. So he's got to think a little.

Q I understand.

A We're not considered right bright in the staff, you know. You still got to think a little.

Q Tell me whether or not the standard of care requires the surgeon at the beginning of the case, at the beginning of the surgery to be conscious of the fact that it may become necessary during the surgery to actually physically identify the ureter?

A Yes, Sir, it does. This operation should never be done by anyone unwilling to do that and anyone who doesn't have the judgment to know when to do that.

Q Tell me, Dr. Phillips, whether or not the standard of care requires that the surgeon be aware and conscious of the ureter and it's location throughout this entire surgical procedure?

A Yes. And after his gloves are off and he's standing in the room. He has to think about it then. Is there any way in the world that I could have hurt one of those ureters. He's got to say that to himself. And if there is any suggestion or thought or fleeting thought that that might have occurred, he should get a urologist shoot that scope up there and take two pictures or shoot some dye and look and make absolutely sure that hasn't hurt.

What I am saying is there is a little 15–minute procedure, three or four different ones, that you can do, any one of which, that can tell you absolutely that you have not closed off this ureter that you can do right then, right there before you ever get out of the room or before the procedure is completely over. It is checkable readily.

It's not like many things that aren't checkable.

Q Tell me whether or not the standard of care requires the surgeon when he clamps that mesentery and those vessels to know what's in between that clamp?

A Absolutely. It does not require that he see the ureter at that moment, but it does require that he know what's in that clamp.

Q Does that standard require that he satisfy himself that the ureter is not in that clamp?

A Yes, it does.

Q Does the standard of care require the surgeon to know not only what he's clamping but also what he's stitching or sewing up?

A Yes, it does.

. . . .

Q Dr. Phillips, you told us that it was your opinion that Dr. Lowry deviated from the standard of care.

A Right.

Q In your opinion did that deviation cause Mrs. Seats' injury to her ureter.

A Yes, it did.

. . . .

Q Is there anything in Dr. Lowry's deposition or in that Operative Note that you have before you that would indicate that Dr. Lowry recognized intellectually, as you say, that at some point during this operation he might need to physically locate that ureter?

A No.

Q Is the contrary, in fact, true, based on your review of his deposition?

A The contrary is true.

Q And what statement attributed to Dr., did Dr. Lowry make?

A I saw in the deposition two places. One said that you can't see the ureter in the retroperitoneum. That's an absolute falsehood. And, two, that the ovary was lifted up and the clamp was placed behind it and some kind of sewing—and I'm not trying to be mean—some kind of sewing that I don't really understand occurred.

And the ovary was cut out and it was, that was that.

Q As far as preparation for the case and thinking about having to find the ureter, was there a statement made by Dr. Lowry in his deposition?

A Yeah. He said he doesn't ever look for it, that you don't have to look for it, that you do this procedure this way, and based on doing this procedure this way, this doesn't very often happen but it can happen. Well, isn't that nice?

Q Does this happen very—

A If you're careful this does not have to happen at all. It does not at all, ever. And if it does happen, there's something wrong with you when you're doing it. I don't know what it is and don't care what it is, but something's wrong with you. Slop talk like that, lift something up, put a clamp on, cut it out, I don't want any part of it.

. . . .

Q Dr. Phillips, based on your examination of the records and Dr. Lowry's deposition, what is your opinion about how the ureter was injured, how the stitch was put in it, how this all happened?

A Well, if you, if you read the, the Operative Note and try to visualize the way this occurred, what you find is that the ovary and the fallopian tube are lifted up on, on the membrane, my shirt sleeve being the membrane, and the clamp is put beneath them and the dissection is carried out over the clamp or next to the ovary, all of this with the intent of preventing any injury. But that in there the ureter was pulled and a ligature, which was apparently put in with a suture, in all probably [sic] went around the ureter or a knuckle of the ureter and obstructed it because later we find out that the ureter was obstructed. That doesn't mean that it was caught up in tissue and kinked or partially obstructed or pulled out of position. It was obstructed. Well, it's virtually got to have a tie around it to be completely obstructed.

And you kind of get an intellectual substantiation of that when you find out that 48 hours later the doctor who works to correct the injury takes out a piece of the injury because he said it's devitalize. It's, it's injured to the point he's fearful of leaving it, being afraid that it will rot and a hole will come in and urine will leak out and kill you, or being afraid that it will stenose on down and very slowly close off over a long period of time.

Q Let me take you back to one thing you said a few minutes ago. I believe I heard you say that if that stitch in the ureter had been removed during the operation or shortly thereafter that she would have been okay. Did I understand that right?

A Yeah. If it had been removed anytime in the next two, three, or four hours it would have been all right.

Q Are you saying that then had he caught his error in surgery and fixed it there that none of this subsequent surgery by Dr. Butterworth and none of these visits to Dr. Butterworth in the emergency room would have been necessary?

A Absolutely. None of that. That's why I got so angry about the question. If he had just thought, "Is this hurt," and found out, none of this would occur. They wouldn't be having the grief they're having. I wouldn't be up here from Florida, and that wouldn't be all over the board there, and this girl wouldn't have been going back and forth to see the doctor with tubes hanging out of her.

. . . .

Q As I understand it, what your testimony basically comes down to is that you say Dr. Lowry deviated from the standard of care because this lady ended up with a complication.

A No, not at all. You didn't listen. I said that he deviated from the standard of care because she had a simple, semi-routine operation that resulted in a severe ureteral injury, one necessitating having to take a segment of the ureter out two days later and left an operating room and went into a ward where she had pain and somebody discovered that she was sick. That's what I said.

. . . .

Q So you're saying the fact that it occurred is proof of the negligence.

A   I'm saying you should do this operation and not injury anybody, yes, flat out, and if you have, you should know it.   And it's that simple and that easy to understand.

It is the insistence of Dr. Lowry that Dr. Phillips and the jury improperly and contrary to T.C.A. 29–26–115(d)[2] presumed Dr. Lowry was guilty of negligence because of the injury which she received.

In light of Dr. Phillips' testimony hereinbefore set out, we conclude that this is not the case.   Indeed, Dr. Phillips testified that Dr. Lowry was negligent because of his actions rather than because of the result of his surgical procedure.   Moreover, we are inclined to believe that the prohibition against a jury presuming negligence does not preclude an expert from testifying that a physician is guilty of negligence based upon the injury received, especially in light of T.C.A. 29–26–115(c), which provides the following:

(c) In a malpractice action as described in subsection (a) of this section there shall be no presumption of negligence on the part of the defendant.   Provided, however, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

By his second issue Dr. Lowry insists that the Court committed reversible error in refusing to charge portions of his special requests numbers two and four, and all of his request number three.

The omitted portion of the special requests are set out in Dr. Lowry's brief as follows: (See appendix for entire text of all three special requests.)

### SPECIAL REQUEST NO. 2

Physicians must be allowed a wide range in the exercise of their judgment and dis-

cretion.   The science of medicine is not an exact science.   In many instances there can be no fixed rule by which to determine the duty of a physician, and he must often use his own best judgment and act accordingly.   By reason of that fact, the law will not hold a physician guilty of negligence, even though his judgment may later prove erroneous in a given case, unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally and the specialty practiced by the defendant physician as it existed in January 1991, in Bristol, Tennessee and similar communities.

As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot · be found guilty of negligence even though it may afterwards develop that he was mistaken.   Where there is a difference of opinion among physicians with reference to the treatment to be given in a particular case, a physician will not be held liable for malpractice if he follows the course of treatment advocated by a considerable number of physicians of good standing in his profession.

### SPECIAL REQUEST NO 3

In order for an expert witness to testify as to the standard of care of a physician in this or similar community, such witness must first demonstrate knowledge of what that standard is.   It then becomes the function of you, the jury, to decide whether that knowledge is sufficient, and to what extent, if any, his opinion is entitled to be considered by you in deciding whether a defendant has practiced in accordance with or below the standard of care prevailing in Bristol, Tennessee or a similar community.   This is what is meant by the "weight of the testimony" and you are the judge of that weight.

I charge you further that testimony by an expert witness that he personally would use or prefer another or different method

---

**2.**   (d) In a malpractice action as described in subsection (a) of this section, the jury shall be instructed that the claimant has the burden of proving, by a preponderance of the evidence, the negligence of the defendant.   The jury shall be further instructed that injury alone does not raise a presumption of the defendant's negligence.

or procedure than that employed by Dr. Lowry or that such different method would be "better" or "more appropriate" for the treatment of Sheila Seats, does not establish the applicable standard of care, and the fact that such alternative method was not followed would not create liability or require you to find negligence or malpractice on the part of a defendant unless you also find from a preponderance of the evidence that the method and means used by Dr. Lowry in the care of Sheila Seats was contrary to the standard governing the practice of general surgery in Bristol, Tennessee or similar communities.

### SPECIAL REQUEST NO. 4

It is a physician's privilege to decide between one of two or more courses in the treatment of his patient, and he cannot be held responsible for an erroneous exercise of judgment. This privilege is subject, however, to the limitation that before exercising judgment, the physician should inform himself by proper examination so as to ascertain the facts and circumstances on which a reasonable exercise of judgment might rest. This is what physicians refer to as the exercise of clinical judgment. ... The law credits the physician with the presumption that he has discharged his full duty. . . .

Mere negligence on the part of Dr. Lowry, standing alone, is not sufficient under the law of Tennessee to render him liable. Before you can find Dr. Lowry liable, you must find from the evidence that Sheila Seats suffered injury which resulted from his lack of care and skill. A bare possibility of such result is not sufficient. If you find from the evidence that the injury to Sheila Seats' ureter may have been due to one of two or more causes, any one of which may have been the sole, proximate cause, before you can find for the plaintiff, you must also find from the evidence that as between the two or more causes it was Dr. Lowry's negligence that caused the condition. If, on the evidence, equally probable causes of the condition are present for one or more of which Dr. Lowry is not responsible, you are not permitted under the law to speculate, guess or surmise as to the actual cause. Thus, if you find that the expert medical evidence shows more than one equally probable cause for Sheila Seats' condition, for one or more of which Dr. Lowry is not responsible, the plaintiff has failed to sustain the burden of proof and your verdict will be for the defendant.

■ Our review of the special requests, vis-a-vis, the charge as given, persuades us that although the requests may have been sanctioned in earlier cases by this Court and the Supreme Court, the Trial Court did not commit reversible error. His charge, as given, which—as appropriate to the facts of this case—employed almost the exact language of the Pattern Jury Instructions, told the jury that negligence could not be presumed nor inferred from the results of a doctor's actions, and that a doctor is not a guarantor of the results of his treatment. Additionally, the charge as given covered in substance part of the omitted material in the special request.

■ Moreover, we are inclined to believe that the specifics set out in the requested charge would have been inferred by the jury from the charge as given. Still further, we conclude that even if it was error to refuse the charges, it was harmless as contemplated by Rule 36 of the Tennessee Rules of Appellate Procedure in that it is obvious from the jury verdict it accredited the testimony of Dr. Phillips over the testimony to the contrary by Dr. Lowry and the expert appearing on his behalf.

Finally, as to this issue, the jury was specifically charged the following:

Now, in order to recover the Plaintiff must prove by preponderance of the evidence and by expert medical proof the following: (1) The recognized standard of acceptable professional practice in the profession and in the specialty thereof that Dr. Lowry practiced in the community in which he practiced, that being Bristol, Tennessee, or in a similar community at the time that the alleged injury or wrongful action occurred. (2) That Dr. Lowry acted with less than or failed to act with ordinary and reasonable care in accor-

dance with such standard. And (3) that as a proximate result of Dr. Lowry's negligent act or omission Sheila Seats suffered injuries which would not otherwise have occurred.

In an action where medical malpractice is alleged you may not presume negligence on the part of Dr. Lowry. The Plaintiff, before she may be permitted to recover has the burden of proving by a preponderance of the evidence and by expert medical testimony that Dr. Lowry was negligent or, stated another way, he deviated from the acceptable professional practice required of him in the practice of general surgery in the care of Sheila Seats and that such deviation proximately caused Sheila Seats' injury.

The fact that Sheila Seats may have suffered a bad outcome, that is to say that her left ureter was injured during surgery, does not allow you to presume that Dr. Lowry was negligent in this care of her. Negligence must always be proved by a preponderance of the evidence.

A physician or a surgeon such as Dr. Lowry is not negligent simply because his efforts proved unsuccessful. It is possible for a physician or surgeon to err in judgment or to be unsuccessful in his treatment without being negligent. By undertaking treatment he does not guarantee a good result, but he is responsible for an injury to his patient resulting from his lack of the requisite knowledge and skill or his failure to exercise reasonable care or to use his best judgment.

We have no hesitancy in concluding that the jury would certainly have exonerated Dr. Lowry absent a finding that Ms. Seats had carried her burden of proving that he was negligent and that his negligence was the proximate cause of her injuries.

For the foregoing reasons the judgment of the Trial Court is affirmed and the cause remanded for collection of the judgment and costs below. Costs of appeal are adjudged against Dr. Lowry and his surety.

McMURRAY and SUSANO, JJ., concur.

# APPENDIX

## DEFENDANT'S SPECIAL REQUEST NO. 2

A physician undertaking the treatment of a patient cannot and does not guarantee the outcome, nor is the physician required to exercise the highest degree of skill possible. He is only required to possess and exercise that degree of skill, care and learning ordinarily possessed and exercised by members of his profession and in his specialty, in this case general surgery, in good standing in his community. It is his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning and to act accordingly to his best judgment.

Physicians must be allowed a wide range in the exercise of their judgment and discretion. The science of medicine is not an exact science. In many instances there can be no fixed rule by which to determine the duty of a physician, and he must often use his own best judgment and act accordingly. By reason of that fact, the law will not hold a physician guilty of negligence, even though his judgment may later prove erroneous in a given case, unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally and the specialty practiced by the defendant physician as it existed in January, 1991, in Bristol, Tennessee and similar communities.

As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be found guilty of negligence even though it may afterwards develop that he was mistaken. Where there is a difference of opinion among physicians with reference to the treatment to be given in a particular case, a physician will not be held liable for malpractice if he follows the course of

treatment advocated by a considerable number of physicians of good standing in his profession.

Vaughn v. Oliver, 3 Tenn. App. 559; (1926)

Floyd v. Walls, 26 Tenn. App. 151, 168 S.W.2d 602 (1941)

McPeak v. Vanderbilt University Hospital, 33 Tenn. App. 76, 229 S.W.2d 150 (1950)

### DEFENDANT'S SPECIAL REQUEST NO. 3

In order for an expert witness to testify as to the standard of care of a physician in this or similar community, such witness must first demonstrate knowledge of what that standard is. It then becomes the function of you, the jury, to decide whether that knowledge is sufficient, and to what extent, if any, his opinion is entitled to be considered by you in deciding whether a defendant has practiced in accordance with or below the standard of care prevailing in Bristol, Tennessee or a similar community. This is what is meant by the "weight of the testimony" and you are the judge of that weight.

I charge you further that testimony by an expert witness that he personally would use or prefer another or different method or procedure than that employed by Dr. Lowry or that such different method would be "better" or "more appropriate" for the treatment of Sheila Seats, does not establish the applicable standard of care, and the fact that such alternative method was not followed would not create liability or require you to find negligence or malpractice on the part of a defendant unless you also find from a preponderance of the evidence that the method and means used by Dr. Lowry in the care of Sheila Seats was contrary to the standard governing the practice of general surgery in Bristol, Tennessee or similar communities.

McCay v. Mitchell, 463 S.W.2d 710, 718 (Tenn. App. 1970)

Gresham v. Ford, 241 S.W. 408 (Tenn. 1951)

Floyd v. Walls, 168 S.W.2d 602 (Tenn. App. 1941)

Lewis v. Hill, 770 S.W.2d 752 (Tenn. App. 1988)

## DEFENDANT'S SPECIAL REQUEST NO. 4

A physician is not negligent simply because his efforts prove unsuccessful and a bad outcome results. Such does not raise a presumption of negligence on the part of a physician. It is possible for a physician to err in judgment or to be unsuccessful in the management of the care of a patient without being negligent. By undertaking treatment, Dr. Lowry does not guarantee a good result.

It is a physician's privilege to decide between one of two or more courses in the treatment of his patient, and he cannot be held responsible for an erroneous exercise of judgment. This privilege is subject, however, to the limitation that before exercising judgment, the physician should inform himself by proper examination so as to ascertain the facts and circumstances on which a reasonable exercise of judgment might rest. This is what physicians refer to as the exercise of clinical judgment.

Generally, whether or not the facts of a particular case constitute lack of skill or negligence is not a question for a jury of laypersons to determine from their own knowledge, for it is the law in Tennessee that in cases involving alleged medical malpractice, the question of skill of a physician in the treatment of patients, the case must be controlled exclusively by expert testimony. In other words, whether Dr. Lowry was unskillful or negligent in the care of Sheila Seats is to be determined by you from the testimony of experts, including the defendant, skilled in general surgery. The law credits the physician with the presumption that he has discharged his full duty. Similarly, and if you find a deviation, whether or not such deviation proximately caused the injury, in this case the injury to Sheila Seats' left ureter, is to be determined by you

exclusively from expert medical testimony, that is to say, physicians trained and skilled in the particular field.

Mere negligence on the part of Dr. Lowry, standing alone, is not sufficient under the law of Tennessee to render him liable. Before you can find Dr. Lowry liable, you must find from the evidence that Sheila Seats suffered injury which resulted from his lack of care and skill. A bare possibility of such result is not sufficient. If you find from the evidence that the injury to Sheila Seats' ureter may have been due to one of two or more causes, any one of which may have been the sole, proximate cause, before you can find for the plaintiff, you must also find from the evidence that as between the two or more causes it was Dr. Lowry's negligence that caused the condition. If, on the evidence, equally probable causes of the condition are present for one or more of which Dr. Lowry is not responsible, you are not permitted under the law to speculate, guess or surmise as to the actual cause. Thus, if you find that the expert medical evidence shows more than one equally probable cause for Sheila Seats' condition, for one or more of which Dr. Lowry is not responsible, the plaintiff has failed to sustain the burden of proof and your verdict will be for the defendant.

> Redwood v. Raskind, 350 S.W.2d 414 (Tenn. App. 1961)
>
> Floyd v. Walls, 168 S.W.2d 602 (Tenn. App. 1941)
>
> McPeak v. Vanderbilt University Hospital, 229 S.W.2d 150 (Tenn. App. 1950)
>
> T.P.I. - CIVIL 6.04
>
> T.C.A. Sect. 29-26-115(d)