**Lois Chandler FULMER, et al., Appellants**

v.

**Jerry Don RIDER, et al., Appellees.**

**No. 1519.**

Court of Appeals of Texas, Tyler.

June 17, 1982.

Rehearing Denied July 22, 1982.

J. T. Maroney, Jr., Maroney & Whiteker, Lufkin, M. G. Holt, Holt, Tatum & McCarver, Nacogdoches, Howell E. Stone, Talbert, Giessel & Stone, Houston, Robert A. Fanning, Don Martinson, Fanning, Harper, Wilson, Martinson & Fanning, Dallas, for appellants.

Craig Stripling, Stripling & Sutton, Forrest G. Braselton, Nacogdoches, Jerry L. Calhoon, McDonald, Calhoon & Kolstad, Palestine, for appellees.

McKAY, Justice.

This is an appeal from a judgment in a suit for damages in which the wife and daughters of Vernis Fulmer (Fulmer), deceased, sought to recover for the wrongful death of Fulmer. Fulmer's death occurred during an altercation involving Fulmer and Jerry Don Rider (Rider), during which Fulmer was shot and killed, and Rider and Nancy Hester (Hester) were shot and wounded. Rider and Hester filed separate counterclaims alleging that their bullet wounds were caused by the negligence of Fulmer.

Lois Chandler Fulmer, Individually and as Executor of the Estate of Fulmer, Charlotte Fulmer Murphy, and Sandra Fulmer Davidson are appellants; Rider and Hester are appellees.

Trial was to a jury.[1] With regard to appellant's claim for damages, the jury failed to find Rider negligent in firing the rifle that resulted in the death of Fulmer.

Regarding Rider's counterclaim, the jury found that Fulmer was negligent (1) in pointing the rifle in the direction of Rider; (2) in discharging the rifle at a time when Rider was in the path of its barrel; and that both acts of negligence were a proximate cause of his injury.

In connection with the counterclaim of Hester, the jury found that Fulmer was negligent (1) in pointing a rifle in the direction of Hester; (2) in discharging a rifle at a time when Hester was in the path of its barrel; and that both these negligent acts proximately caused her injury.

The jury did not find that Fulmer was acting in self-defense when he shot Rider and Hester, as contended by appellants. The jury did find that Rider was acting in

---

1. The jury answered: (1) Rider shot Fulmer with a rifle; (2) failed to find that Rider was negligent in shooting Fulmer; (4) Rider fired the rifle at Fulmer; (5) failed to find Rider negligent in firing the rifle at Fulmer; (7) Fulmer pointed a rifle in the direction of Rider; (8) such action was negligence and (9) a proximate cause of the injury to Rider; (10) Fulmer discharged a rifle when Rider was in the path of its barrel; (11) such action was negligence and (12) a proximate cause of Rider's injury; (13) Fulmer pointed a rifle in the direction of Hester; (14) such action was negligence and (15) a proximate cause of injury to Hester; (16) Fulmer discharged a rifle at a time when Hester was in the path of its barrel; (17) such action was negligence and (18) a proximate cause of injury to Hester; (19) failed to find that Fulmer shot Rider in self defense; (20) failed to find that Fulmer shot Hester in self defense; (21) failed to find Hester was acting as a principal to Rider in the shooting of Fulmer with the rifle; (22) Rider was acting in self defense or in defense of Hester in shooting Fulmer; (24) no damages for Lois Chandler Fulmer or (25) Sandra Fulmer Davidson or (26) Charlotte Fulmer Murphy; (27) damages to Rider, $363,200; (28) damages to Hester, $683,200.

self-defense or in Hester's defense in shooting Fulmer, but failed to find that Hester was acting as a principal to Rider in Fulmer's shooting.

On January 1, 1979, Fulmer hired appellees Rider and Hester to manage the Clayton House Apartments. Their duties were to collect rent and keep track of the apartment units that were available for rental. In return, appellees were to receive a rent-free apartment.

On July 25, 1979, Hester called Mrs. Fulmer and told her she had collected some rent money that needed to be picked up. On that same day Fulmer appeared at the apartment occupied by appellees. Fulmer came in through the back door into the kitchen. Hester asked Fulmer if he wanted a Coke and prepared one for him. Fulmer then sat down at one end of the dining room table. Rider was at the other end of the dining room table and Hester was sitting at the table between Fulmer and Rider.

At the point in time when Fulmer and appellees were seated at the dining room table, Rider's AR–15 rifle was leaned against a desk in the dining room area. The rifle was equidistant to Fulmer and Rider. This rifle had rounds in it, including a bullet in the chamber. A purse belonging to Hester was on the table and it contained a .38 pistol.

Fulmer and Hester initially discussed the rental money that he was there to pick up. Hester was chastised by Fulmer for having taken two fifty dollar deposits on two rental units when the deposit should have been one hundred dollars per apartment.

Fulmer then asked Rider when appellees would be ready to move back to the apartment unit which they had earlier vacated because of flooding in the unit. Rider pointed out to Fulmer that the initial lease between appellees and Fulmer had expired, and that they disagreed with Fulmer about a few of their job requirements. Fulmer responded to Rider that appellees were like everyone else who worked for Fulmer because they wanted something for nothing.

Hester told Fulmer that he (Fulmer) was not well known for returning rental deposits; that he wouldn't make adequate repairs to the tenants' apartments; and that he refused to allow appellees to rent to blacks. Hester asked Fulmer whether he would help with the expenses that they would incur in moving because of the flood. Fulmer said "hell no" and added that he didn't take them to raise and share their expenses. After hearing Fulmer's response, Hester said to Rider, "let's move" and then stood up and began walking down the hall to her bedroom.

While proceeding to her bedroom, Hester heard Fulmer ask Rider what things were bothering him. Rider responded that there were three problems. First, appellees did not want to assist Fulmer in confiscating tenants' televisions and stereos after they were only two or three days delinquent in their rent. Second, Rider wanted to discontinue the practice of storing confiscated property in one of the two bedrooms located in appellee's apartment. Finally, Rider wanted permission to rent to blacks.

At that point in time, the discussion had become heated insofar as Fulmer was concerned. Fulmer stated that appellees would do things his way or no way at all. Fulmer threatened to give Rider a "good thrashing." When Rider finally refused to renew the lease, Fulmer told him that they had thirty-six (36) hours to move out and that Rider was going to lose his three hundred dollar deposit.

Finally, after Fulmer became loud and aggressive and started cursing, Rider told Fulmer that he would have to leave the apartment unit or Rider would have Hester call the police. Fulmer responded "there ain't nobody going to throw me out of my own G.D. house, I own these S.O.B.'s. There ain't nobody going to do it."

From the back bedroom Hester could not hear all of the conversation between Fulmer and Rider, but she did hear Fulmer say: "Boy, you don't know who you're messing with"; and "Nobody tells me to get out of my own property." She also heard Rider say to Fulmer that if Fulmer

didn't leave he was going to have Hester come in and call the police.

Fulmer then turned and reached for the AR–15 rifle. In doing so, he said "I'll kill you first." After Fulmer grabbed the gun, he turned and pointed it at Rider. Fulmer flinched like he expected a recoil from the AR–15. It was on safety. At that time Fulmer had his finger on the trigger.

Fulmer started flipping the gun over looking for a safety. Rider didn't get out of his chair until Fulmer started flipping the gun looking for the safety. Then Rider ran at Fulmer. Fulmer side-stepped Rider and butted him with the gun. This caused Rider to fall to the floor on one knee with his back to Fulmer. Rider turned, went back after Fulmer, and was only a couple of feet away from Fulmer when Fulmer shot him. When the bullet hit Rider, it did not knock him backwards but just turned him a little bit to the side. He continued his forward motion which brought him into contact with Fulmer. Rider fell forward on his knees with his arms around Fulmer's back like a bear hug. Fulmer had the AR–15 rifle down and out in front of him so that Rider couldn't reach him [it]. Rider yelled for Hester to come help him and get the gun away from Fulmer. Hester responded by going to the bedroom door, opening it, and taking a couple of steps into the hallway where she stopped. Rider then called again for help while Hester was in the hallway and she moved forward to a location closer to Fulmer and Rider. At that time, Fulmer gave an indication that he had seen Hester come into the hallway and he responded: "I'll kill her, I'll kill her." While saying those words, Hester testified Fulmer was slowly taking the gun in his hands and very slowly moving it around to a point where he had the gun pointed at her. Rider testified "he looked back down and reached the gun around, never aimed at nothing. Just pointed the gun in a direction and fired it." The rifle

in Fulmer's hand discharged and hit Hester in the left leg near the upper part of her thigh.

After Fulmer shot Hester, his body relaxed for just a second. Rider got a hold on the barrel of the gun. The two wrestled around for the gun. When Rider wrestled the gun away, he threw Fulmer toward the end of the hallway. At that point, Rider and Fulmer were approximately eight feet apart. Fulmer said, "Son, give me the gun; Son, give me the gun. I can fix this." Hester heard Rider tell Fulmer, "Don't come any closer, just leave." Fulmer said again, "Son, give me the gun; I can fix this." At that point, Hester noticed Fulmer's right hand going up the back side of his leg as if he were going to put his hand in his pocket. Hester screamed at Rider to watch Fulmer's hands. When Rider shifted his eyes off of Fulmer's eyes in order to look and see what Fulmer was doing with his hands, Fulmer ran at Rider and Rider shot him. It was later discovered that Fulmer was carrying a loaded pistol in his right hand pants pocket.

As a result of these circumstances, Fulmer was killed and Rider and Hester suffered bullet wounds that required medical treatment.

■ We first discuss the question concerning the Dead Man's Statute. By their ninth point, appellants urge that all testimony of appellees Rider and Hester was barred by art. 3716,[2] Tex.Rev.Civ.Stat.Ann. (Vernon 1926); and that absent their testimony there was no evidence, or alternatively, insufficient evidence to submit special issues 7 through 18 to the jury. Since Lois Chandler Fulmer brought this suit in her representative capacity as executor of the Estate of Vernis Fulmer, the statute would seem to apply. However, when the testimony of a witness, otherwise incompetent to testify under art. 3716, is taken by depo-

2. Art. 3716, Tex.Rev.Civ.Stat.Ann. (Vernon 1926), provides in part:

In actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them as such,

neither party shall be allowed to testify against the others as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party....

sition, or he is called as a witness during trial by the opposite party, and inquiry is initiated about a transaction with the deceased, the statute is waived and such witness may testify fully about such transaction. *Chandler v. Welborn,* 156 Tex. 312, 294 S.W.2d 801, 809 (1956); *Kandy, Inc. v. Presslor,* 556 S.W.2d 99, 101 (Tex.Civ.App.— Waco 1977, writ ref'd n. r. e.); *Smith v. Smith,* 607 S.W.2d 617, 621 (Tex.Civ.App.— Waco 1980, no writ). The record reveals that appellants called both Rider and Hester as adverse witnesses to testify about the shooting incident. (Additionally, appellees' briefs state appellants took Rider's and Hester's depositions.) We hold that appellants waived the Dead Man's Statute, and overrule their ninth point.

Appellant's first eight points of error contend there was no evidence, or insufficient evidence, (1) to submit issue eight inquiring whether the pointing of an AR–15 rifle in the direction of Rider by Fulmer was negligence; (2) to submit issue eleven inquiring whether the discharge of an AR–15 rifle by Fulmer when Rider was in the path of its barrel was negligence; and (3) to submit issues fourteen and seventeen making the same inquiries concerning Hester that issues eight and eleven make concerning Rider.

Appellants argue the testimony of Rider and Hester does not indicate nor prove that Fulmer acted negligently in shooting them; to the contrary, they contend all the evidence demonstrates that Fulmer acted willfully and intentionally in shooting Rider and Hester. Appellants urge us to sustain their no evidence and insufficient evidence points because appellees tried and submitted their case on a negligence theory and did not seek any issues on whether Fulmer acted willfully and intentionally. Thus, appellants' position is that appellees failed to prove their case.

Appellants cite one Texas case and two cases from other jurisdictions to sustain their contention that a negligent injury and a willful and intentional injury are separate and distinguishable torts, and that proof of a willful and intentional injury will not support findings of negligence. *Nat'l Union Fire Ins. Co. v. Bourn,* 441 S.W.2d 592 (Tex.Civ.App.—Fort Worth 1969, writ ref'd n. r. e.) cited by appellants, holds that where the evidence proves an intentional injury, negligence issues should not be submitted. In that case four college students "burst" through the door of the room of another student and beat him, rendering him unconscious and damaging his left eye so badly it had to be removed. Bourn filed suit against all four, one of whom admitted liability, and a jury trial was had against the other three. The jury found (1) McClellan committed an assault and battery upon plaintiff; (2) McClellan acted in concert with others; (3) the failure of McClellan to restrain others from committing an assault and battery was negligence; and (4) such negligence was a proximate cause of the occurrence. After judgment became final against McClellan, et al., this suit was brought by Brown against the insurance company on a liability policy. It was stipulated that McClellan and Bovio participated in inflicting intentional injuries upon Bourn. McClellan was found to be negligent. Upon appeal, the court said:

> The negligence issues should not have been submitted. The whole record proves a concerted, intentional attack upon plaintiff. The plaintiff was the victim of intentional violence. If there was any negligence on the part of the four defendants it was merely incidental to their conduct in carrying out their plan to intentionally commit an assault upon plaintiff. *Id.* at 596.

Since *Bourn* was an insurance case the court held that the conduct of the four students was not covered by the policies of insurance since intentional acts were effectively excluded.

Appellants also cite *Martin v. Yeoham,* 419 S.W.2d 937 (Mo.App.1967), in which plaintiff was shot with a gun by defendant, and plaintiff sued for damages alleging defendant was negligent in firing the weapon and inflicting the wound. The court said at 419 S.W.2d at 944: "It is elementary that the words 'negligence' and 'intentional' are

contradictory and that 'negligence' is not synonymous with 'intentional action,'" citing 65 C.J.S. *Negligence* § 1(7) (1966). Quoting from *McLaughlin v. Marlatt*, 296 Mo. 656, 246 S.W. 548 (Mo.1922), the *Martin* opinion further states:

> Where one person is injured by the discharge of a firearm in the hands of another, he may have an action for assault and battery, if the shooting was intentional; or he may have an action for negligent injury, if the shooting was unintentional and the result of negligence. But the cause of action in the one case is different from that in the other, and both cannot arise on the same state of facts.... Allegations of facts constituting a cause of action for personal injury willfully inflicted will not, therefore, be supported by proof of an injury negligently committed. *Martin v. Yeoham, supra,* at 945.

The third case cited by appellant is *Lail v. Woods,* 36 N.C.App. 590, 244 S.E.2d 500, 502 (1978), where the court stated "[A]n intentional act of violence is not a negligent act," and cited *Jenkins v. North Carolina Dep't of Motor Vehicles,* 244 N.C. 560, 94 S.E.2d 577, 580 (1956).

In Rider's reply brief he contends there was no error in submitting issue eight (whether pointing a rifle in Rider's direction was negligence) because there was sufficient evidence to support its submission; the evidence did not conclusively establish that Fulmer intended to shoot Rider; and, even if the evidence did so establish, it is permissible to waive intent and rely upon negligence. Rider makes the same contentions regarding issue eleven (whether discharging a rifle when Rider was in the path of its barrel was negligence). Hester makes the same contentions with respect to issues fourteen and seventeen.

Appellees cite *Travelers Ins. Co. v. Reed Co.,* 135 S.W.2d 611 (Tex.Civ.App.—Beaumont 1940, writ dism'd judgmt cor.) as authority to support their contention that they may waive intent to injure and rely upon negligence. The question in that case

was whether the insurance company was obligated to defend a suit charging negligence against its insured. The plaintiff charged that the acts of defendant in a prior suit constituted negligence which was an action within the coverage of the policy of insurance, and that choosing to sue for negligence was "an election of remedies which he had the right to make between himself and appellee [defendant in prior suit]." *Id.* at 617. The court, however, noted, "But appellant [Travelers Ins. Co.] was not bound by Brown's [plaintiff] election." *Id.* The court held the facts did not constitute any willful intent to injure Mrs. Brown, but constituted gross negligence. The court said at page 618: "The absence of the intent to inflict injury distinguishes negligence from other torts."

Appellees cite and rely upon *Evett v. Corbin,* 305 S.W.2d 469 (Mo.1957) which was a suit for personal injuries alleged to have been received when plaintiff was struck by an automobile driven by the defendant. Plaintiff and defendant had been drinking together, had arguments and a fight, and defendant had put plaintiff out of his car twice. It was urged in that case that although the plaintiff pleaded negligence as a basis of recovery, he tried his case on an entirely different theory—that defendant intentionally struck plaintiff with his automobile. The court there said: "Although negligent acts and willful and intentional acts are distinguishable, they are not necessarily repugnant." *Id.* at 472. The court cites *Miller v. Harpster,* 273 Mo. 605, 201 S.W. 854, 856 (Mo.1918) and states that in *Miller* "[T]he court held that an allegation in plaintiff's petition that the injuries were willfully and maliciously inflicted did not absorb and destroy the charges of negligence where the defendant did not seek a reformation of the petition or an election as to rival theories." *Id.* In discussing defendant's contention that no submissible case was made, the court in *Evett* quotes from *Miller*:

> The same principle carried to its logical conclusion would lead to the result that every action for negligent wrong could be

defeated by a showing that there lurked inside the brain of the wrongdoer the secret intention to perpetrate the act. To avoid this the common law permitted the injured party to waive the intent, and rely upon the neglect.... *Id.*

The court in *Evett* also states, "[I]n a civil action for damages it generally rests with the person injured by intentional wrongdoing to elect to treat the injury as negligently inflicted. In such case he is said to waive the intent and rely on the neglect." *Id.*

Appellees also rely upon a statement made by the court in *Dartez v. Gadbois,* 541 S.W.2d 502, 506 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ), to-wit: "An intentional act may nevertheless constitute negligence on the part of the actor." *Id.* at 506. No authority is cited by the Dartez court for the quoted sentence.

Additional cases cited by appellees are *North Side State Bank v. Hunter,* 452 S.W.2d 34 (Tex.Civ.App.—Houston [14th Dist.] 1970, writ ref'd n. r. e.), *Michels v. Crouch,* 122 S.W.2d 211 and *Michels v. Boruta,* 122 S.W.2d 216 (both cases, Tex.Civ.App.—Eastland 1938, no writ). In the *Hunter* case, the primary allegation was negligence and the alternative allegation was willful and intentional assault. *Crouch* is not helpful to appellees; to the contrary, it substantiates appellants' position. *Crouch* was a suit for willful trespass upon graves in a cemetery. The trial court submitted the case on negligence, and the court of civil appeals reversed and remanded, concluding that plaintiff's petition pled an action for willful trespass, and was "insufficient to authorize recovery for damages resulting from defendant's negligence...." *Michels v. Crouch, supra* at 213. The court further·said:

> Trespass is a willful or intentional wrong, and liability therefor is not dependent upon negligence. Where the suit is for damages resulting from a willful trespass only, it is erroneous to submit to the jury the question of a defendant's negligence. A judgment based on findings of negligence is not supported by mere allegations of a willful trespass.... (citations

omitted) It is fundamental that a plaintiff must recover, if at all, upon the cause of action alleged.... (citations omitted) The case, at least insofar as it was submitted to the jury on the issues of negligence and the judgment based on findings of negligence, was tried upon a wrong theory, and must be reversed. *Id.* at 214.

■ Our research compels us to conclude that Fulmer's shooting of appellees was shown by all the evidence to be a willful and intentional act, and that appellees are not entitled to recover upon negligence, even though negligence was pled and submitted to the jury. We believe sufficient authority exists to support our conclusion, although there is little Texas authority on this point. *Nat'l Union Fire Ins. Co. v. Bourn, supra,* holds that where the evidence proves an intentional injury, negligence issues should not be given. *Bourn* seems to say that a negligent injury and a willful and intentional injury are separate and distinguishable torts. In our view the weight of authority follows that premise, as does *Michels v. Crouch, supra.*

In 65 C.J.S. *Negligence* § 1(7) (1966), we find this language:

> The difference between intent and negligence, in a legal sense, ordinarily is nothing but the difference in the probability, under the circumstances known to the actor and according to common experience, that a certain consequence or class of consequences will follow from a certain act. *The words "negligence" and "intentional" are contradictory; negligence is not synonymous with intentional action.* (Emphasis added.)

And again in 65 C.J.S. *Negligence* § 3 (1966) it is said:

> Intent is not an element of negligence, at least ordinarily. On the contrary, *negligence excludes the idea of intentional wrong; the absence of an intent or purpose to inflict injury of which complaint is made is essential to the legal conception of negligence, is the, or a, distinguishing characteristic thereof, and is an element which distinguishes it from other*

*torts,* since, *where an intention to inflict the injury exists,* whether that intention is actual or constructive only, *the wrongful act is not negligent but is one of violence or aggression or is fraudulent, willful, or wanton.* (Emphasis added.)

Restatement (Second) of Torts § 282, Comment d, (1965) reads as follows:

The definition of negligence given in this Section includes only such conduct as creates liability for the reason that it involves a risk and not a certainty of invading the interest of another. *It therefore excludes conduct which creates liability because of the actor's intention to invade a legally protected interest of the person injured* or of a third person. (Emphasis added.)

Professor Prosser uses the following language:

To be held liable for assault, the defendant must have intended to interfere with the plaintiff's personal integrity—which is to say that he must have intended to bring about an assault, a battery, or an imprisonment. *There is, properly speaking, no such thing as a negligent assault.* (Emphasis added.) Prosser, The Law of Torts, ch. 2, sec. 10 at 40–41 (4th ed. 1971). *See also, Id.* ch. 2, sec. 8 at 31.

The Supreme Court of Missouri, in *Sharp v. Robberson,* 495 S.W.2d 394, 397 (Mo. 1973), said:

Ordinarily [punitive] damages are not recoverable in actions for negligence, because *negligence,* a mere omission of the duty to exercise care, *is the antithesis of willful or intentional conduct....* (Emphasis added.)

We note that *Sharp v. Robberson* is a much later case by the same court which decided *Evett v. Corbin, supra.* In an earlier case, *McClanahan v. St. Louis Public Service Co.,* 363 Mo. 500, 251 S.W.2d 704, 708 (1952), the same court quoted a previous opinion and stated, "negligence is one kind of tort, an unintentional injury usually predicated upon failure to observe the prescribed standard of care, 52 Am.Jur., Torts, § 20, pp. 373–374, while a willful, wanton, reckless act is another kind of tort, an intentional act often based upon an act done in utter disregard of the consequences ...." *See Ervin v. Coleman,* 454 S.W.2d 289, 291 (Mo. App.1970); *Gimenez v. Rissen,* 12 Cal. App.2d 152, 55 P.2d 292, 296–97 (1936), and *Cosentino v. Heffelfinger,* 360 Mo. 535, 229 S.W.2d 546, 550 (1950).

The Supreme Court of North Carolina in *Jenkins v. North Carolina Dep't of Motor Vehicles,* 244 N.C. 560, 94 S.E.2d 577 (1956) said:

*Negligence,* in all its various shades of meaning, is an outgrowth of the action of trespass on the case and *does not include intentional acts of violence.* For example, an automobile driver operates his car in violation of the speed law and in so doing inflicts injury as a proximate result, his liability is based on his negligent conduct. On the other hand, if the driver intentionally runs over a person it makes no difference whether the speed is excessive or not, the driver is guilty of an assault and if death results, of manslaughter or murder. *If injury was intended it makes no difference whether the weapon used was an automobile or a pistol. Such willful conduct is beyond and outside the realm of negligence.* (Emphasis added.) *Id.* at 580, 94 S.E.2d 577.

In *Andres v. Perry,* 81 A.D.2d 848, 438 N.Y.S.2d 852 at 853 (1981), the court said:

The uncontradicted testimony established that the infant plaintiff was injured when the defendant struck him in the face with his fist. Clearly, a cause of action for the intentional tort of battery was made out. Nevertheless, plaintiffs framed this complaint solely on a theory of negligence, presumably in order to reach the "deep pocket" of defendant's insurer, which had issued a policy covering defendant's negligence but excluding liability for intentional acts.

In our view, the evidence offered at trial was insufficient to sustain the plaintiffs' negligence theory and, therefore, the complaint should have been dismissed.

The court further held that although pleadings should be liberally construed "[l]iberal-

ity in pleading is stretched too far when it is deemed permissible to plead one claim and then substitute for it an entirely different one." *Id.*

Another 1981 case, *Ford v. Politte*, 618 S.W.2d 44, 46 (Mo.App.) states, "a submission on the theory of negligence is not justified by evidence only of an intentional deliberate act. The two are inconsistent and mutually exclusive." *See Bazley v. Tortorich*, 397 So.2d 475 (La.1981) and *Mayer v. Blue Cross Ins. Co.*, 402 So.2d 273 (La.App.1981).

We quote from 57 Am.Jur.2d *Negligence* § 13 (1971):

"Negligence" is ordinarily used in common-law terminology to express the foundation of civil liability for an injury to person or property, which is not the result of premeditation and formed intention. The absence of a positive intent to inflict injury is a distinguishing characteristic of negligence.... Although negligence implies the power of volition at the time of the act or omission relied upon as constituting the wrong, intent to commit a wrongful act is not a material element of ordinary actionable negligence. That an act is inadvertent and not intentional does not negative negligence, since the very essence of negligence is inadvertence.

It is said in 57 Am.Jur.2d *Negligence* § 103 (1971) "conduct when characterized by wilfulness rather than by inadvertence transcends negligence and is different in kind. ...."

█ Appellants do not refer us to any Texas authority for their contention that they were privileged to make an election of remedies, waive the intentional injury, and proceed to trial on negligence. Appellants cite only the two Missouri cases, *Evett v. Corbin, supra* and *Miller v. Harpster, supra.* We decline to follow them.

In our view the facts in this case constitute an intentional injury which is distinguishable from negligence. It follows that there is insufficient evidence to support the submission of issues 8, 11, 14 and 17. Appellants' points 2, 4, 6 and 8 are sustained. Other points are not reached.

Judgment of the trial court is reversed and the cause remanded.