**Opinion issued January 30, 2014.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-12-00619-CV**

_____

**JAMES LEONARD FINLEY, Appellant**

**V.**

**P.G., Appellee**

**On Appeal from the 236th District Court**
**Tarrant County, Texas**[*]
**Trial Court Case No. 236-227641-07**

## O P I N I O N

This appeal arises from a suit to recover damages for sexual assault, battery,

and intentional infliction of emotional distress. After a bench trial, the court

---

[*]    Pursuant to its docket equalization authority, the Supreme Court of Texas transferred the appeal to this Court. *See* Misc. Docket No. 12–9107 (Tex. Jun. 18, 2012); *see also* TEX. GOV'T CODE ANN. § 73.001 (West 2013) (authorizing transfer of cases).

awarded the appellee, P.G., damages for past and future mental anguish, future medical expenses, punitive damages, and prejudgment interest. Appellant James Leonard Finley challenges the propriety of these awards, arguing that the evidence was insufficient to support each class of damages. He further contends that the trial court's award of punitive damages was improperly based on a contradictory finding of both malice and gross negligence. Finally, he argues that the trial court abused its discretion in awarding prejudgment interest for prospective and punitive damages (a point that P.G. concedes).

We conclude that the record presents adequate evidence to support the damages awarded by the trial court. Accordingly, we affirm the judgment, modified to limit the award of prejudgment interest to P.G.'s past mental anguish damages.

## Background

P.G. was twenty-one years old and working as a cashier when he first met Finley, who was then a pastor with the First United Methodist Church in Euless. Finley noticed a cross that P.G. was wearing and struck up a conversation with him. He asked to meet further with P.G. to talk and pray. In the months that followed, Finley grew close to P.G. and his mother.

Although he was twenty-one, the evidence at trial showed that P.G. was immature and childlike. He lived at home with his mother, a widow. Slow to

develop, sensitive, and often bullied at school, P.G. had always had trouble making friends despite his trusting nature. He and his mother were thus gratified when Finley entered his life as a friend and father figure. Growing up, P.G. had been religious and a frequent participant in church activities; accordingly, he and his mother appreciated that Finley was a pastor. P.G.'s mother described church as "his refuge."

Apart from his naiveté, P.G. was also hampered by cognitive difficulties that contributed to his immature condition. His mental health counselor, Robin Evangelisto, described him as lacking "the emotional and cognitive functioning" of a normal adult his age. She affirmed a discrepancy between his "physical age and mental age" and characterized him as naive, unsophisticated, and possibly learning disabled. Kimberly Althouse, a detective in the family crimes unit who conducted an investigation of the events giving rise to P.G.'s claim, described him as having "cognitive disadvantages" and as being "extremely immature for someone his age." Interacting with P.G., the officer said, "was just like working with an adolescent . . . like a 12, 13-year-old boy."

In the months that followed their initial meeting, Finley became a familiar presence in P.G.'s life. Finley provided gifts of money and food, bringing breakfast from McDonald's once a week at a time when P.G.'s family was experiencing financial troubles. Finley also began referring to P.G. as "Sweetie" and "Sweet

Boy." In her testimony, Althouse described this behavior as "grooming," a process typical of sexual predators in which a conspicuously vulnerable person is targeted for exploitation. She further explained that Finley had been successful in gaining P.G.'s trust and making him feel comfortable.

On the morning of December 1, 2005, Finley brought breakfast to P.G. at his family's apartment. Finley hugged him and grabbed his buttocks. The two then sat down to eat and watch television together. While P.G. was cleaning up after breakfast, Finley groped P.G.'s penis from outside of his clothing. Finley then tried to reach inside his pants, but P.G. said "no, not yet." At this point, Finley ceased his advances and left the apartment. In his own testimony, Finley admitted that P.G. had never given any indication that he wanted to engage in sexual relations with him. He further acknowledged that on the morning of the incident he had asked P.G. whether he was sexually experienced, and he received a negative answer.

P.G. called the police, and Althouse arrived that day to investigate. She was struck by P.G.'s marked immaturity for a person of his age. He appeared "very, very upset, very childlike." He was crying and shaking so much that she had difficulty understanding him; she noted that he was "really uncomfortable" using the word "penis" and discussing the morning's events. She further described him

4

as fearful and in a state of severe emotional distress. While testifying, P.G. described himself as having felt "disgusted," "gross," and "like . . . a whore."

As part of her investigation, Althouse arranged to record a phone call between P.G. and Finley. During the conversation, Finley apologized for his actions, explained that he had grabbed P.G.'s penis because "he wanted to," and expressed a wish to perform fellatio on P.G. for his first time. After hearing this conversation, Althouse obtained a warrant for Finley's arrest.

Later in the day, Finley returned to P.G.'s apartment and tried to enter. The police were called and intercepted him as he was leaving the complex. Finley was then arrested.

P.G. brought suit alleging battery, intentional infliction of emotional distress, and violation of the criminal sexual assault statute, TEX. PENAL CODE ANN. § 22.011 (West 2011). After a bench trial, the judge entered judgment in favor of P.G. He also made findings of fact and conclusions of law substantiating P.G.'s claims of intentional infliction of emotional distress and battery. These included findings of both malice and gross negligence on the part of Finley. Exemplary damages, damages for past and future mental anguish, damages for future medical expenses, and prejudgment interest were awarded. This appeal followed.

**Analysis**

**I.      Future medical expenses**

Finley argues that the evidence was legally insufficient to support the trial court's award of $45,000 in damages for future medical expenses. For the reasons below, we disagree with Finley that the evidence was legally insufficient.

There are four circumstances in which a court of appeals should find evidence legally insufficient: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 TEXAS L. REV. 361, 362–63 (1960)). When applying these criteria, we assess the evidence in the light most favorable to the finding, indulging every reasonable inference in its favor. *Id.* at 822. The ultimate question is whether the trial evidence would enable fair and reasonable people to reach the verdict under review. *Id.* at 827.

When future medical expenses are sought for personal injuries, Texas law does not require absolute certainty before they may be awarded but only a "reasonable probability" that they will be incurred. *Doctor v. Pardue*, 186 S.W.3d

6

4, 20 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (citing *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)); *see Fisher v. Coastal Transp. Co.*, 149 Tex. 224, 229, 230 S.W.2d 522, 525 (1950). Fact-finders may base their judgment "on the injuries suffered, the medical care rendered before trial, the progress toward recovery under the treatment received, and the condition of the injured party at the time of trial." *Rosenboom*, 995 S.W.2d at 828 (citing *City of San Antonio v. Vela*, 762 S.W.2d 314, 321 (Tex. App.—San Antonio 1988, writ denied), and *Pride Transp. Co. v. Hughes*, 591 S.W.2d 631, 633 (Tex. Civ. App.—Eastland 1979, writ ref'd n.r.e.)). In other words, "No precise evidence is required." *Marquette Transp. Co. Gulf-Inland, LLC v. Jackson*, No. 01-10-01025-CV, 2012 WL 1454476, at *12 (Tex. App.—Houston [1st Dist.] Apr. 26, 2012, no pet.) (mem. op.) (citing *Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App.—San Antonio, 2004, no pet.)).

What the plaintiff must ultimately show is that "in all reasonable probability, future medical care will be required and the reasonable cost of that care." *Rosenboom*, 995 S.W.2d at 828 (citing *Thrailkill v. Montgomery Ward & Co.*, 670 S.W.2d 382, 384 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.)). By assessing "the nature of the injuries, the medical care rendered before trial, and the condition of the injured party at the time of trial," *Marquette*, 2012 WL 1454476, at *12, the trial judge was permitted to reach a conclusion in light of his own

7

experience and common knowledge. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (explaining that a trial judge was not bound by expert testimony as to the cost of repairing a water leak). And because "an award of future medical expenses . . . lies largely within the factfinder's discretion," appellate courts are especially hesitant to disturb a fact-finder's conclusion in this regard. *See, e.g.*, *Marquette*, 2012 WL 1454476, at *12; *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied).

In this case, the trial court heard testimony from P.G.'s counselor, Evangelisto, about his past course of mental-health treatment, the cost of his counseling sessions ($90 each), and the probable need for more counseling in the future. Finley argues that Evangelisto's testimony must be discounted because she had not seen P.G. in five years at the time of her testimony and was unaware of other traumatic events in his past, including abuse by his deceased father. However, Finley failed to preserve any error in the admission of this testimony by obtaining a ruling on his objection to Evangelisto's expression of an opinion as to P.G.'s future need for counseling. *See* TEX. R. APP. P. 33.1. In the absence of a properly preserved objection, Evangelisto's statements form part of the record on appeal. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 411 (Tex. 1998) ("Appellate courts must base their decisions on the record as made and brought forward, not on a record that should have been made or could have been made.").

With Evangelisto's testimony in the record, Finley's arguments are misdirected to the extent that they go to the weight to be accorded to the evidence. And insofar as he argues that the existence of other psychological traumas hopelessly muddles the project of tracing P.G.'s injuries to Finley's battery, he disregards the fact that the judge was entitled to resolve conflicts in the evidence.

According to Evangelisto's testimony, P.G. was suffering from posttraumatic stress disorder—an ailment that cannot be cured, only managed—and as such, he was likely to need counseling into the foreseeable future. Billing records revealed that P.G.'s past course of treatment involved weekly sessions. In closing argument, counsel for P.G. proposed weekly, $90 sessions as the basis for calculating the cost of future medical expenses. With respect to the future duration of these recurring sessions, Evangelisto opined that the need for them was likely to continue indefinitely.

Aside from this expert testimony as to past and likely future medical care, the court also had before it evidence of P.G.'s injuries and his condition at trial. Althouse testified to P.G.'s distraught condition in the aftermath of the incident, mentioning physical symptoms and other indications of great shock resulting from Finley's battery. Further, P.G. and his mother spoke at length about the persistent decline in his well-being and demeanor following the incident.

The trial court took judicial notice of the fact that P.G.'s life expectancy, according to the federal census tables, was 69.5 years. P.G. was twenty-seven at the time of trial. P.G. asserts in his brief that the court's $45,000 award approximates the cost of weekly $90 sessions for ten years. Although P.G.'s simple calculation ignores the time value of money, we nevertheless observe that the award of $45,000 is less than an appropriately discounted sum that would account for P.G.'s expected 42.5 remaining years of life. Given that the expert testimony, billing records, and life expectancy tables could have supported a much larger award, we conclude that the court's award was based upon legally sufficient evidence.

## II.    Mental anguish

Finley argues that the evidence was legally insufficient to support the trial court's awards of $25,000 in damages for past mental anguish and $15,000 in damages for future mental anguish. We disagree.

Texas courts define mental anguish as a "relatively high degree of mental pain and distress." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). As the *Parkway* court explained, "It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe

disappointment, indignation, wounded pride, shame, despair and/or public humiliation." *Id.*

We will uphold an award of mental anguish damages against a legal sufficiency challenge when the claimant has "introduced direct evidence of the nature, duration, and severity" of his mental anguish, thus establishing a "substantial disruption" in his daily routine. *Id.* Alternatively, an award of mental anguish damages may be supported by some evidence of "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Id.* (quoting *J.B. Custom Design & Bldg. v. Clawson*, 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ)).

In considering a mental anguish award, we must be tolerant of the limits of proof in this realm. As this court recently explained, "The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (quoting *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.)). Given the lack of objective measures, the task of fixing the exact amount of damages—provided the existence of some compensable mental anguish has been established—is "generally left to the discretion of the fact finder." *Id.* (quoting *Pentes Design, Inc.*

*v. Perez*, 840 S.W.2d 75, 80 (Tex. App.—Corpus Christi 1992, writ denied)); *see also Marquette*, 2012 WL 1454476 at *9, *12; *Marvelli v. Alston*, 100 S.W.3d 460, 482 (Tex. App.—Fort Worth 2003, pet. denied).

However, the discretion of a fact-finder in fixing an award of damages for mental anguish is not without limits. While recognizing that juries must be afforded "a measure of discretion in finding damages" for mental anguish, the Supreme Court of Texas has also held that "[t]here must be evidence that the amount is fair and reasonable compensation." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996); *see also Marquette*, 2012 WL 1454476, at *9.

There was ample direct evidence at trial of the nature, duration, and severity of the mental anguish experienced by P.G and of consequent interference with his daily routine. Indeed, P.G. himself testified as to the shame and discomfort he has experienced. *See Marquette*, 2012 WL 1454476, at *9 (allowing for mental anguish to be established by the injured party's testimony). He reported that he thinks about the incident "every day," and said that at the time of the incident, he felt "disgusted," "gross," and like "a whore." *See N.N. ex rel. A.B. v. Inst. For Rehab. & Research*, 234 S.W.3d 1, 10 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Feeling dirty, for a sexual assault victim, is a mental sensation of pain that is in essence the equivalent emotion of shame.").

Apart from P.G.'s own testimony, the trial court also could have considered the testimony of his mother and sister-in-law. After the incident, P.G. experienced nightmares, had trouble sleeping, and would pace the floor at night, checking the door "four or five times." He strictly avoided church (even though he previously had been religious) and he rocked himself in the back pew on the single occasion he did attend church. He could not abide the touch of strangers, such as bumping and jostling in crowds. On one occasion when he and his mother went Christmas shopping, he became upset and asked to be taken home. Further, although he had previously engaged in normal romantic relationships, he could not tolerate the touch of his girlfriend after the incident. In general, he became more reticent, staying at home and sleeping. He appeared depressed and had difficulty maintaining employment. Temperamentally, he became more touchy, distrustful, and quick to anger.

In sum, the evidence at trial demonstrated the nature, duration, and severity of P.G.'s mental anguish and was legally sufficient to support an award of $25,000 for past mental anguish. *See Parkway*, 901 S.W.2d at 444; *O'Dell v. Wright*, 320 S.W.3d 505, 514–15 (Tex. App.—Fort Worth 2010, pet. denied) (upholding $425,000 mental anguish award to sexual assault victim who felt "dirty," experienced anxiety that made her feel stiff and unable to move, and suffered shaking, nightmares, and racing pulse). P.G. experienced shame, fear, and distress

13

from ordinary contacts with others. These feelings and behaviors began with the battery and continued at least until the time of trial. The evidence showed that P.G.'s mental anguish was severe enough to interfere with his everyday life: disrupting his sleep, inhibiting his romantic life, interfering with his employment, stopping him from attending church, keeping him at home during the day, and making him averse to crowds.

With specific reference to future mental anguish, the foregoing proof also provides a legally sufficient basis for an award of $15,000. As with damages for future medical expenses, P.G. need only show a reasonable probability that he will suffer compensable mental anguish in the future. *See Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008) (per curiam) (citing *Fisher v. Coastal Transp. Co.*, 149 Tex. 224 S.W.2d 522, 523–24 (1950)). As P.G. points out, the Supreme Court of Texas has sustained an award of $20,000 in future mental anguish damages on evidence of mental distress similar to that in this case. *See Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797–98 (Tex. 2006). In *Fifth Club*, the injured party and his wife testified that he "continued to be depressed, humiliated, non-communicative, unable to sleep, and angry, continued to have headaches and nightmares, and that his daily activities and his relationships with his wife and daughter continued to be detrimentally affected." *Id.* at 797. Nearly every one of these emotional and behavioral afflictions has parallels in the

14

evidence surveyed regarding P.G.'s condition. Moreover, the Court in *Fifth Club* emphasized that the jury was faced with an injured party who had endured a "severe beating." *Id.* at 798. A sexual assault is also a traumatic personal injury, and the judge could have properly considered the nature and severity of P.G.'s battery in making his award. We thus find no error in the trial court's award of damages for future mental anguish.

## III.  Punitive damages

Finley objects to the trial court's $100,000 punitive damages award on three grounds. He first argues that the trial court's finding that he acted with both malice and gross negligence (either of which can support an award of punitive damages) was illogical and contradictory. Second, he asserts in the alternative that the evidence was legally and factually insufficient to support a finding of gross negligence. Third, he claims that the evidence was legally insufficient to support a finding of malice. For the reasons below, we uphold the trial judge's malice finding and the award of punitive damages. Consequently, it is unnecessary for us to separately address Finley's challenges to the court's finding of gross negligence.

### A.  Alleged inconsistency of findings

In general, Texas requires a finding of fraud, malice, or gross negligence to support an award of exemplary damages. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West 2008). The plaintiff must show by clear and convincing

15

evidence that the harm of which he complains results from one of these circumstances before exemplary damages may be awarded. *Id.*

Insofar as Finley contends that a finding of malice and a finding of gross negligence are mutually exclusive in relation to any particular incident constituting an intentional tort, we do not agree. He relies on *Gavrel v. Lieberman*, No. 2-08-414-CV, 2010 WL 1270334 (Tex. App.—Fort Worth Apr. 1, 2010, no pet) (mem. op.), and *Fulmer v. Rider*, 635 S.W.2d 875 (Tex. App.—Tyler 1982, writ ref'd n.r.e.). These cases, however, do not stand for the proposition that a finding of gross negligence and a finding of malice are contradictory but only for the principle that negligence and assault are separate causes of action. *See Gavrel*, 2010 WL 1270334, at \*2–3 ("A plaintiff may not recover for an intentional tort by proving only negligence. . . . Likewise, a plaintiff may not recover in negligence when he proves only an intentional tort." (citations omitted)); *Fulmer*, 635 S.W.2d at 881–883 ("[A] negligent injury and a willful and intentional injury are separate and distinguishable torts."). In other words, negligence and an intentional tort (such as assault or battery) are separate torts such that each requires distinctive proof. Neither *Gavrel* nor *Fulmer* addresses the question raised by Finley: whether both malice and gross negligence can result in the same intentional tort.

Malice is defined by statute as "a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7). Gross negligence is defined as:

[A]n act or omission:

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Id.* § 41.001(11). Both malice and gross negligence require that the actor harbor certain mental states. Nonetheless, there is neither logical nor psychological impossibility in a person like Finley taking action that "involves an extreme degree of risk" with both an "actual, subjective awareness of the risk involved [and] with conscious indifference to the rights of others" and "a specific intent . . . to cause substantial injury or harm." *Id.* § 41.001. On the contrary, the Texas Penal Code recognizes that proof that a malefactor acted intentionally constitutes proof that he also acted knowingly, recklessly, and criminally negligently. TEX. PENAL CODE ANN. § 6.02(e) (West 2011). We therefore find no merit in Finley's argument that the trial judge's findings on malice and gross negligence are contradictory.

## B. Sufficiency of evidence of malice

When reviewing the legal sufficiency of the evidence to support an award of punitive damages, an appellate court must be mindful of the burden of proof governing the determinations of the fact-finder. An elevated burden of proof at trial requires a higher standard of review on appeal. *City of Keller*, 168 S.W.3d at 817 (citing *Jackson v. Virginia*, 443 U.S. 307, 320 n.14, 99 S. Ct. 2781 (1979)). Clear and convincing evidence is such an elevated burden of proof with respect to an award of punitive damages: it is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations." *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Accordingly, although we will still view the evidence in the light most favorable to the outcome and give deference to the fact-finder's reasonable resolution of disputed issues, we must be satisfied that a reasonable finder of fact could have formed a firm belief or conviction that its conclusion was true. *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 609 (Tex. 2004) (citing *J.F.C.*, 96 S.W.3d at 266).

Finley argues that there was no evidence in the record that he intended to harm P.G and that any evidence of his intent was to the contrary. In his brief, he points to his own testimony that he had not intended to harm P.G., that he had believed P.G. to be a normal adult, and that he had heard a recording left by P.G. on the family answering machine stating "this is the gay place." He also calls our

attention to the testimony of P.G. and his mother that Finley was a loving man and did not intend harm.

The record evidence, viewed as a whole, was legally sufficient to produce a firm conviction in the mind of a reasonable fact-finder that Finley acted with malice, i.e., a specific intent to cause substantial injury or harm to P.G. *See* TEX. CIV. PRAC. & REM. CODE § 41.001(7). There was ample evidence that the trial judge could have credited from which to paint a convincing portrait of Finley as a predator who targeted P.G. due to his vulnerability as an immature, cognitively limited adult.

Such a conclusion finds support in the testimony of P.G.'s mental health counselor, Evangelisto, who spoke to a disparity in his physical and mental age, and of Althouse, who described his immaturity and cognitive difficulties. P.G.'s mother provided further evidence of his susceptibility to exploitation in her testimony about the family's financial difficulties, and her son's naive, trusting nature.

As for predatory behavior, the evidence showed that Finley had given money to P.G., regularly brought him breakfast, and used names like "Sweetie" and "Sweet Boy" to refer to him. The trial judge also heard testimony from Althouse, an officer experienced in sexual crimes, that Finley's behavior resembled that of a sexual predator grooming a target. Adding to the predatory

19

picture, there was evidence from Finley himself that he knew P.G. to be sexually inexperienced, that P.G. had given no indication of wanting to participate in sexual activity with Finley, and that Finley proposed another sexual encounter on the telephone after being rejected the morning of the incident.

Having reviewed evidence from which malice could be inferred, we should also consider evidence that militates against such a finding. We are tasked with considering all of the evidence (albeit in the light most favorable to the finding) and not just the evidence in favor of the judgment. *Garza*, 164 S.W.3d at 627. We must be equally mindful, however, to disregard evidence which a reasonable fact-finder could have disbelieved or found incredible. *Id.* Finley testified that he thought of P.G. as a "normal" adult and did not regard him as having mental difficulties. He claimed to have heard a message left by P.G. on the answering machine describing his home as "a gay place," and he further denied any intent to harm the young man. P.G. and his mother testified to the effect that Finley was a loving man and did not intend harm.

The evidence that Finley had benign intentions was not so potent that it must have shaken a reasonable fact-finder from a firm conclusion that Finley acted with malice. The judge was not required to credit or treat as conclusive the statements by Finley, P.G., and his mother in regards to Finley's motives, intent, or his awareness of any disability in P.G. Moreover, even if its existence is assumed, the

20

alleged message on P.G.'s answering machine need not be construed as evidence that Finley's sexual advances were invited or otherwise innocent. We thus conclude that the evidence was legally sufficient to support the trial court's finding of malice, and we overrule Finley's challenge to the punitive damages award.

## IV.    Waiver of factual insufficiency claims

Finley has also suggested that the evidence is factually insufficient to support the trial court's findings as to malice and its awards of damages for future medical expenses, past mental anguish, and future mental anguish. However, in each relevant section of his brief, Finley raises his factual sufficiency challenges in a single sentence. Since Finley fails to direct the court to evidence that would support these contentions and fails to present analyses explaining the application of the independent factual sufficiency standard to the proof, we deem these points of appeal waived for inadequate briefing. *See* TEX. R. APP. P. 38.1(i) (demanding "clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *Morris v. Am. Home Mortg. Servicing, Inc.*, 360 S.W.3d 32, 36 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

## V.    Prejudgment interest

Finley argues that the trial court erred by awarding prejudgment interest on the punitive damages, future mental anguish damages, and damages for future medical expenses. P.G. concedes this issue. Texas statute bars prejudgment interest

on future damages, TEX. FIN. CODE ANN. § 304.1045 (West 2006), and punitive damages, TEX. CIV. PRAC. & REM CODE ANN. § 41.007 (West 2008). We will modify the judgment accordingly.

## Conclusion

We modify the judgment to reflect that only the award of past mental anguish damages will bear prejudgment interest. As modified, we affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Keyes, Higley, and Massengale.