**Opinion issued August 30, 2018**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-16-00724-CV

—————————————

**LMMM HOUSTON #41, LTD. AND LMMM HOUSTON #41, LTD., DBA LA MICHOACANA MEAT MARKET #41, Appellants/Cross-Appellees**

**V.**

**JESUS SANTIBANEZ, Appellee/Cross-Appellant**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-19771**

---

## MEMORANDUM OPINION

Appellants/cross-appellees, LMMM Houston #41, Ltd. and LMMM Houston #41, Ltd., doing business as La Michoacana Meat Market #41 (collectively, "La Michoacana Meat Market"), challenge the trial court's judgment, entered after a jury trial, in favor of appellee/cross-appellant, Jesus Santibanez, in his suit against La

Michoacana Meat Market for premises liability. In three issues, La Michoacana Meat Market contends that the evidence is legally insufficient to support the jury's findings in favor of Santibanez on his claim for premises liability and the trial court erred in instructing the jury on premises liability.

In his sole cross-point, Santibanez contends that the trial court erred in granting La Michoacana Meat Market a judgment notwithstanding the verdict ("JNOV") on the ground that no evidence supports the jury's award of $120,000 in future medical expenses.

We affirm.

## Background

In his third amended petition, Santibanez alleged that on December 17, 2013, he, while shopping at a La Michoacana Meat Market store, "slipped and fell on grease that had been spilled on the floor" and "sustained serious, debilitating and painful injuries." He asserted a claim for premises liability against La Michoacana Meat Market, seeking damages for physical disfigurement, and past, present, and future physical pain, mental anguish, physical impairment, and medical expenses.

La Michoacana Meat Market filed an answer, generally denying the allegations and asserting that Santibanez's fall was the result of his own negligence or an unavoidable accident.

At trial, Santibanez testified that on the evening of December 17, 2013, he went to La Michoacana Meat Market to purchase meat, tortillas, and vegetables. When he entered the store, he first went to find the meat and tortillas. And then, as he approached the produce aisle, Santibanez "slipped on" "pork lard" and fell to the floor. He hit his face, knees, and back "very hard," and he "twisted [a]round," "very badly," injuring his back. As a result of the fall, Santibanez felt pain in his lower back, his nose swelled, his knees hurt, and he felt "dizzy."

Santibanez explained that he could not see any of the warnings signs that had been placed in the area where the pork lard had been spilled because the shelf holding the produce "covered" them, they were "behind" the shelf and placed up against it, and he was "looking [at] the vegetables" and not at the floor. Thus, as he approached the produce aisle, he was not aware of any danger, and he saw the warning signs only after he had fallen and "hit one" of them. According to Santibanez, if La Michoacana Meat Market had placed the warning signs "in front" of the produce aisle, he would not have fallen down. He opined that there was nothing he could have done to avoid falling because as soon as he turned to enter the produce aisle he was "already on the floor." And he noted that he did not walk down the produce aisle because he mistakenly believed the lard on the floor to be water.

After his fall, Santibanez, with his face, clothes, and hands "full of lard," asked a cashier to call for La Michoacana Meat Market's manager. The cashier told

Santibanez that "he was every sorry . . . and evidently they hadn't cleaned [the area where the pork lard had been spilled] properly." When he spoke to the manager, he showed her "all the lard that [he] had on [his] body" and his swollen nose. And she said that she was "very sorry" and "apparently the person who had done the [cleanup] job hadn't done it properly." The manager also gave Santibanez cream for his nose, "some tablets," and tea, and she offered to take him to see a doctor that evening or the next day if he was not feeling well.

When Santibanez returned home that night, he could not eat dinner "because of the pain." The next day, he called La Michoacana Meat Market's manager to tell her that he was in "severe pain," and she took him "to a clinic that belong[ed] to . . . La Michoacana [Meat Market]." The doctor at the clinic told him that he had "swelling in [his] lower back" and sent him to the emergency room at Bayshore Medical Center. Santibanez noted that at the time he went to the Bayshore Medical Center, his primary complaint was lower back pain. A doctor, diagnosing him as having muscle strain, related to his back, and contusions, prescribed medication for him and recommended that Santibanez follow-up with an orthopedic surgeon within forty-eight hours.

Santibanez subsequently went to the Southeast Chiropractic Center, where he received physical therapy, which helped lessen his back pain, but did not eliminate it completely. He received chiropractic treatment for approximately five months,

4

attending approximately thirty appointments, but he did not feel "healed" at the end of his treatment. At the conclusion of his treatment, the doctor at Southeast Chiropractic Clinic concluded:

> Due to the severity of [his] injuries, his prognosis is guarded. [His] injuries are subject to episodes of remission and exacerbation by various aggravations from activities of daily living and times of stress. It is likely that [he] may experience future episodes of pain and weakness as a result of [his] residual unresolved injuries . . . . [Santibanez] is advised to seek continued care with an orthopedic specialist if symptoms continue to worsen. Future treatment is indicated on an as needed basis to help pain experienced from aggravations caused by [his] performance of his activities of daily living.

In addition to the treatment that he received at the Southeast Chiropractic Center, Santibanez, at Memorial MRI & Diagnostic, had MRIs made of his lower back and both knees. According to Santibanez, the MRI of his lower back showed that his "lower discs are injured about 5 centimeters, each one," and the MRIs of his knees showed inflammation and "spread -- liquid."

Santibanez also saw an orthopedic surgeon, Dr. Mark S. Sanders, who "gave [him] tablets for the pain" and a "recommendation of what [he] needed to [do to] fix the problem [in his] back." And he saw Dr. José Rodriguez, an orthopedic specialist, who concluded that he had "developed back, knee and foot pain, associated with headaches" after his fall at La Michoacana Meat Market. Rodriguez advised Santibanez to seek a "neurological evaluation for [his] headaches and memory issues" and continue to participate in physical therapy. Further, both Rodriguez and

5

the doctor at the Southeast Chiropractic Clinic "recommended ongoing care for [Santibanez] based on [his] pain, [his] symptoms, and [his] memory issues from [his] head injury." As of trial, Santibanez had not seen a neurologist.

Santibanez further testified that prior to his fall at La Michoacana Meat Market, he had never been in pain, never seen a doctor to treat lower back pain, and never seen a chiropractor. Nor had anyone, before his fall, ever suggested that he should see an orthopedic surgeon for back pain. However, since his fall, he is always in pain, "[s]ometimes it's strong, and sometimes it's weaker," but it is "always there." And he described his pain, at the time of trial, as "very bad" and "terrible."

In regard to his "quality of life," Santibanez explained that he "can't do what [he] used to do before." He cannot run, go to the gym or to the movies, swim, eat at restaurants, or "stand for a long time." He has problems performing tasks at his work because of "the pain [that he] feel[s]." The pain in Santibanez's back also causes pain in his knee and in his foot. And if he stands for more than an hour or carries something heavy, he feels as if he is "standing on thorns." The pain has also caused Santibanez to become depressed, and hitting his head during his fall caused memory problems and reoccurring headaches, which began two or three days after his fall. He noted that prior to his fall, he did not have "memory issues." In order to manage his pain, Santibanez takes "over-the-counter pain medication" every day and "us[es] a home heating pad" and a "massage sofa." He does not believe that the

6

pain that he feels will ever go away. And he opined that his injuries have gotten worse over time.

In regard to his medical expenses, Santibanez testified that he received bills from Bayshore Medical Center for $2,817, Spencer Highway Emergency Room Physicians for $1,593, Southeast Chiropractic Center for $5,526, Dr. Sanders for $1,000, Memorial MRI & Diagnostic for $7,875, and Dr. Rodriguez for $525. And the total amount of his past medical expenses was $19,396. Further, Santibanez opined that if he were to continue treatment at the Southeast Chiropractic Center or with Rodriguez, he would expect the cost to be similar to what he had been charged in the past.[1]

During Santibanez's testimony, the trial court admitted into evidence Plaintiff's Exhibit 1, a surveillance videotape recording from La Michoacana Meat Market on the evening of December 17, 2013. Santibanez explained that the videotape recording shows him falling down in the store as he turns the corner walking toward the produce aisle. And it shows a La Michoacana Meat Market employee, prior to Santibanez's fall, attempting to clean up the pork lard on the floor of the produce aisle. Santibanez noted that although the employee appears to be cleaning up the lard, he, in reality, is actually just "spreading it all . . . around" the floor with a mop. Santibanez explained that the employee did not use any water,

---

[1] The record contains an extensive amount of Santibanez's medical records.

liquid degreaser, or "any powdered cleanup solution" as he mopped the lard on the floor.

In his deposition, which was read into the record, Santibanez testified that he "didn't pay attention to the warning signs" in the area where the pork lard had been spilled because he "didn't think it was something as dangerous as lard" on the floor, thought it was water, and thought that "it was safe."

Maria Estrada, the manager at La Michoacana Meat Market where Santibanez fell, testified that in order to properly clean up a spill of lard, an employee would need to use a bucket and a mop and should use "hot water and a special soap or degreaser." And the employee should "check[] to see whether the floor [i]s still greasy or whether it [i]s clean" when he is done. The employee should also place warning signs "in the area where the spill" occurred and where "customers can see the[] [signs] before they get to th[e] spill area." Estrada further noted that the purpose of the warning signs is to "announce to the customer that . . . there's a danger approaching."

In regard to Plaintiff's Exhibit 1, the surveillance videotape recording from La Michoacana Meat Market, made on the evening of December 17, 2013, Estrada explained that it shows an employee, Miguel Longoria, mopping the floor. The videotape recording shows that Longoria did not use a bucket of hot water, soap, or any degreaser when cleaning the lard on the floor. Estrada noted that Longoria also

did not "check the floor when he[] [was] done [cleaning] to see if it[] [was still] greasy." However, while watching the videotape recording, Estrada opined that Santibanez could see the warning signs before he turned the corner toward the produce aisle and before he was "in the spill area."

Estrada further testified that she was not at La Michoacana Meat Market when Santibanez fell, and a cashier telephoned to tell her about the fall. When Estrada arrived at the store, she spoke with Santibanez, who told her that he had fallen, but he did not "show [her] the grease that was on his clothes." Santibanez "looked okay," but told her that "his nose hurt." When she offered to take him to see a doctor, he declined and went home.

The next day, Santibanez returned to La Michoacana Meat Market and told Estrada that "he had a pain in his back" and "had to leave his work." After he asked her to "take him to the doctor," she took him to the "La Michoacana Meat Market and Venture [sic] Hospital -- clinic." After leaving the clinic, Santibanez told Estrada "[t]hat everything was okay, that it was just inflammation," for which he had been given three-days' worth of anti-inflammatory medication. Estrada opined that the store did not do "anything wrong" in regard to Santibanez's fall, the area where Santibanez fell had been properly cleaned, and "the warning signs" had been properly placed prior to Santibanez's fall.

9

The jury found that La Michoacana Meat Market's negligence proximately caused Santibanez's fall. It attributed one hundred percent of the liability to La Michoacana Meat Market. And it awarded Santibanez damages in the amount of $20,000 for past medical expenses, $120,000 for future medical expenses, $15,000 for past physical pain and mental anguish, $15,000 for future physical pain and mental anguish, $15,000 for past physical impairment, and $15,000 for future physical impairment.

La Michoacana Meat Market then filed a motion for JNOV related to the jury's award of $120,000 for Santibanez's future medical expenses, asserting that "[n]o expert witness testified in regard to [his] medical condition or the need, if any, for future medical care"; "[t]here was no evidence, or in the alternative, insufficient evidence that [he] required future medical care for which the cost remotely approached $120,000"; his counsel "argued for no more than $20,000 in future medical expenses"; and Santibanez was entitled to "no more than $20,000 in future medical expenses." The trial court granted the motion, reducing the jury's award for future medical expenses to $20,000, "for a total judgment of $100,000, plus pre-judgment [interest]." And it entered judgment against La Michoacana Meat Market on Santibanez's premises-liability claim, awarding him actual damages in the amount of $100,000, pre-judgment interest, and post-judgment interest.

**Jury Charge**

In its first issue, La Michoacana Meat Market argues that the trial court erred in instructing the jury on premises liability because "Question No. 1 [to the jury] did not include the element of concealment as dictated by the Texas Supreme Court"; "[i]n the absence of a properly worded question in the charge, the jury did not assess" La Michoacana Meat Market's "duty based on [a] legally correct standard"; and La Michoacana Meat Market was harmed by the omission of the "element of concealment" from the jury charge.

A trial court "shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 221 (Tex. 2010); *Cont'l Cas. Co. v. Baker*, 355 S.W.3d 375, 382 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Generally, we review a trial court's decision on how to instruct a jury for an abuse of discretion; however, when an appellant challenges a definition as legally incorrect, we review the definition de novo. *Baker*, 355 S.W.3d at 382. If the charge is legally correct, the trial court has broad discretion regarding the submission of questions, definitions, and instructions. *Id.* at 382–83. Thus, we review the trial court's "legally correct definitions and instructions for an abuse of discretion." *Id.* at 383; *see Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34

11

S.W.3d 909, 912 (Tex. 2000). We will not reverse a judgment for charge error unless the error was harmful because it probably caused the rendition of an improper verdict. *Crump*, 330 S.W.3d at 225. In determining whether an erroneous instruction or definition probably caused an improper judgment, we examine the entire record. *Id.*

The trial court submitted the following question and instructions to the jury:

**<u>QUESTION NO. 1</u>**

Did the negligence, if any, of those named below proximately cause the occurrence in question?

With respect to the condition of the premises, LA MICHOACANA MEAT MARKET was negligent if –

    a. the condition posed an unreasonable risk of harm, and

    b. LA MICHOACANA MEAT MARKET knew or reasonably should have known of the danger, and

    c. LA MICHOACANA MEAT MARKET failed to exercise ordinary care to protect JESUS SANTIBANEZ from the danger, by both failing to adequately warn JESUS SANTIBANEZ of the condition and failing to make that condition reasonably safe.

"Ordinary care," when used with respect to the conduct of LA MICHOACANA MEAT MARKET as an owner or occupier of a premises, means the degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.

Answer "Yes" or "No" for each of the following:

    a.  LA MICHOACANA MEAT MARKET    _____

12

b.  JESUS SANTIBANEZ                          _____

We note that neither party disputes that Santibanez was an invitee.  *See Rosas v. Buddie's Food Store*, 518 S.W.2d 534, 536 (Tex. 1975); *Dabney v. Wexler-McCoy, Inc.*, 953 S.W.2d 533, 536 (Tex. App.—Texarkana 1997, pet. denied) ("An 'invitee' is defined as a person who goes on the premises of another in answer to the express or implied invitation of the owner or occupant on the business of the owner or occupant or for their mutual advantage.").  For an invitee to establish the liability of a premises owner, he must prove:  "(1) a condition of the premises created an unreasonable risk of harm to the invitee; (2) the owner knew or reasonably should have known of the condition; (3) the owner failed to exercise ordinary care to protect the invitee from danger; and (4) the owner's failure was a proximate cause of injury to the invitee."  *State Dep't of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992); *see also Henkel v. Norman*, 441 S.W.3d 249, 251–52 (Tex. 2014); *Sugar Land Props., Inc. v. Becnel*, 26 S.W.3d 113, 118–19 (Tex. App.—Houston [1st Dist.] 2000, no pet.).

The Texas Supreme Court has "expressly" dictated "the proper wording" for a premises-liability jury instruction in a case in which the plaintiff is an invitee.  *Adlong v. San Jacinto Methodist Hosp.*, No. 01-02-00847-CV, 2004 WL 811745, at *1 (Tex. App.—Houston [1st Dist.] Apr. 15, 2004, pet. denied) (mem. op.); *see State*

13

*v. Williams*, 940 S.W.2d 583, 584–85 (Tex. 1996). Specifically, the "proper" premises-liability jury instruction provides:

> With respect to the condition of the premises, defendant was negligent if—
>
> a. The condition posed an unreasonable risk of harm;
>
> b. defendant knew or reasonably should have known of the danger; and
>
> c. defendant failed to exercise ordinary care to protect plaintiff from danger, by both failing to adequately warn plaintiff of the condition and failing to make that condition reasonable safe.

*Williams*, 940 S.W.2d 584–85; *Adlong*, 2004 WL 811745, at *1–2; *see also State v. Wolleson*, 93 S.W.3d 910, 914 (Tex. App.—Austin 2002, no pet.) (explaining supreme court in *Williams* "translated" "the[] elements" of premises-liability cause of action "into a jury charge"); Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 66.4 (2014) (above instruction is "appropriate" to use in "premises liability cases in which it is undisputed that the plaintiff [i]s an invitee").

The instruction submitted by the trial court to the jury in the instant case includes the elements that Santibanez, an invitee, was required to prove to establish La Michoacana Meat Market's liability as a premises owner, and it exactly tracks the "proper" premises-liability jury instruction that has been dictated by the supreme court. *See Williams*, 940 S.W.2d 584–85; *Payne*, 838 S.W.2d at 237; *Adlong*, 2004 WL 811745, at *1–2; *Sugar Land Props.*, 26 S.W.3d at 118–19 (noting charge to

14

jury in premises-liability case "included all of the[] elements"); *see also Harris Cty. v. Smoker*, 934 S.W.2d 714, 719–20 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (trial court's charge not improper where it "properly addressed th[e] elements an invitee must prove to establish liability"). Further, a number of courts, including our own, have upheld instructions similar or identical to the trial court's premises-liability jury instruction in this case. *See, e.g.*, *Adlong*, 2004 WL 811745, at *1–2; *Wolleson*, 93 S.W.3d at 914; *Sugar Land Props.*, 26 S.W.3d at 115–16, 118–19; *Smoker*, 934 S.W.2d at 719–20; *see also Bill's Dollar Store, Inc. v. Bean*, 77 S.W.3d 367, 369 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). Notably, we are "duty-bound" to "recognize and apply the Texas Supreme Court's deliberate statement of the law." *Lumpkin v. H & C Commc'n, Inc.*, 755 S.W.2d 538, 540 (Tex. App.—Houston [1st Dist.] 1988, writ denied); *see also Adlong*, 2004 WL 811745, at *2.

Nevertheless, La Michoacana Meat Market argues that the trial court's premises-liability instruction to the jury in this case is legally incorrect because it does not include, as part of the instruction, the "element of concealment." Specifically, La Michoacana Meat Market requested that the trial court instruct the jury regarding premises liability as follows:

> Did the negligence, if any, of those named below proximately cause the injury in question?

15

With respect to the condition of the premises, [La Michoacana Meat Market] was negligent if—

1.    there existed an unreasonably dangerous condition on the premises which posed an unreasonable risk of harm;

2.    [La Michoacana Meat Market] knew or reasonably should have known of the unreasonably dangerous condition.

3.    *the unreasonably dangerous condition was concealed*;

4.    [La Michoacana Meat Market] failed to exercise ordinary care to protect Jesus Santibanez from the danger, by both failing to adequately warn Jesus Santibanez of the condition and failing to make that condition reasonably safe.

    "Ordinary care," when used with respect to the conduct of [La Michoacana Meat Market], as an owner or occupier of a premises, means that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.

5.    Jesus Santibanez was not aware of the condition.

Answer "Yes" or "No" for each of the following:

[La Michoacana Meat Market]: _____

Jesus Santibanez: _____

(Emphasis added.) In support of its argument that the trial court was required to instruct the jury regarding the "element of concealment," La Michoacana Meat Market relies on the Texas Supreme Court's decision in *Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193 (Tex. 2015).

16

In *Austin*, an employee slipped and fell on an oily liquid while mopping a restroom floor at the grocery store where he worked. 465 S.W.3d at 198. After the employee brought suit against Kroger Texas, L.P. ("Kroger"), asserting a premises-liability claim, the United States Court of Appeals for the Fifth Circuit "found that the 'nature and scope' of an employer's duty to provide its employees with a safe workplace [was] 'arguably unclear' under Texas law 'when an employee is aware of the hazard or risk at issue.'" *Id.* at 199 (citations omitted). And it certified the following question to the Texas Supreme Court:

> Pursuant to Texas law, including § 406.033(a)(1)–(3) of the Texas Labor Code, can an employee recover against a non-subscribing employer for an injury caused by a premises defect of which he was fully aware but that his job duties required him to remedy? Put differently, does the employee's awareness of the defect eliminate the employer's duty to maintain a safe workplace?

*Id.* (internal quotations omitted).

Although the supreme court, in its opinion in *Austin*, focused on premises-liability claims in the employment context, the court did note that "an employer has the same premises-liability duty to its employees as other [premises] []owners have to invitees on their premises." *Id.* at 201–02. And the court explained that generally, a premises owner "has a duty to exercise reasonable care to make the premises safe for invitees" and may satisfy its duty "by eliminating the dangerous condition," "mitigating the condition so that it is no longer unreasonably dangerous," or "by providing an adequate warning of the danger." *Id.* at 202. The court, as it

17

had "repeatedly" done in the past, further described a premises owner's duty to an invitee "as a duty to make safe or warn against any *concealed*, unreasonably dangerous conditions of which the [premises] []owner is, or reasonably should be, aware [of] but the invitee is not." *Id.* at 203 (emphasis added).

It is the use of the word "concealed" by the supreme court in describing a premises owner's duty to an invitee on which La Michoacana Meat Market relies in support of its assertion that the trial court, in its premises-liability jury instruction, was required include the "element of concealment" in order for La Michoacana Meat Market, a premises owner, to be held liable in this case.

However, the supreme court, in *Austin*, discussed the issue of "concealment" in the context of a premises owner's duty to make safe or warn of unreasonably dangerous conditions of which a premises owner is aware but an invitee is not, i.e., a condition that is concealed. *See Austin*, 465 S.W.3d at 202–03. Thus, the court explained:

> [T]he Court has repeatedly described a [premises] []owner's duty as a duty to make safe or warn against any concealed, unreasonably dangerous condition[] of which [a premises] []owner is, or reasonably should be, aware [of] but [an] invitee is not.

*Id.* at 203. The court further noted that the rationale for imposing such a duty on a premises owner is that "[t]he [premises] []owner is typically in a better position than the invitee to be aware of hidden hazards on the premises," and, thus, "the law mandates that the [premises] []owner take precautions to protect invitees against

18

such hazards, to the extent th[at] [it] is or should be aware of them." *Id.* The court also explained that a premises owner owes no duty to an invitee when a "condition is open and obvious or known to the invitee," i.e., not "concealed," because, under such circumstances, a premises owner "is not in a better position to discover" the condition and "the law presumes that [an] invitee[] will take reasonable measures to protect [himself] against known risks." *Id.* (noting "[t]his is why the [c]ourt has typically characterized the [premises] []owner's duty as a duty to make safe or warn of unreasonably dangerous conditions that are not open and obvious or otherwise known to the invitee").

Here, we note that to the extent that there is a requirement for a trial court in a premises-liability case involving an invitee to instruct the jury regarding the "element of concealment," the trial court's instruction, as quoted in full above, to the jury in this case sufficiently encapsulated that "element of concealment." And because the instruction submitted by the trial court to the jury in the instant case included the elements that Santibanez, an invitee, was required to prove to establish La Michoacana Meat Market's liability as a premises owner and exactly tracked the "proper" premises-liability jury instruction that has been dictated by the Texas Supreme Court, we hold that the trial court did not err in instructing the jury on premises liability.

We overrule La Michoacana Meat Market's first issue.

19

## Sufficiency of Evidence

In its second issue, La Michoacana Meat Market argues that the trial court erred in not rendering judgment that Santibanez take nothing on his claim for premises liability because "liability cannot be established" where "the condition [on the premises] was not concealed," "Santibanez was aware of the condition," La Michoacana Meat Market "warned of the condition," and Santibanez "was aware of the posted signs warning of the condition."[2] In its third issue, La Michoacana Meat Market argues that the trial court erred in not rendering judgment that Santibanez take nothing on his premises-liability claim because "liability cannot be established" where it "fully discharged its duty to Santibanez" by "[p]lac[ing] [t]wo [w]arning [s]igns [i]n [p]roximity [t]o [t]he [s]pill" and "eliminat[ing] any danger associated by the spill . . . by clean mopping the area."

When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex. App.—Dallas 2012, no pet.). We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the

---

[2]     We note that this issue is separate and distinct from La Michoacana Meat Market's first issue concerning the trial court's charge to the jury. In its second issue, La Michoacana Meat Market is challenging the sufficiency of the evidence to support the jury's finding of liability on the ground that the condition on the premises was not concealed.

20

following: (1) a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822.

Notably, in cases tried to a jury, a legal-sufficiency issue must be preserved in the trial court. *See Steves Sash & Door Co. v. Ceco Corp.*, 751 S.W.2d 473, 477 (Tex. 1988); *Lyon v. Building Galveston, Inc.*, No. 01-15-00664-CV, 2017 WL 4545831, at *7 (Tex. App.—Houston [1st Dist.] Oct. 12, 2017, pet. filed) (mem. op.); *Daniels v. Empty Eye, Inc.*, 368 S.W.3d 743, 748–49 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). There are five ways to preserve for appeal a complaint that the evidence is legally insufficient to support a jury finding: (1) a motion for directed verdict, (2) a motion for JNOV, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *Steves Sash*, 751 S.W.2d at 477; *Lyon*, 2017 WL 4545831, at *7; *Daniels*, 368 S.W.3d at 748–49.

Here, the record shows that La Michoacana Meat Market did not file a motion for directed verdict, object to the submission of Santibanez's premises-liability claim

21

to the jury, or file a motion to disregard the jury's answer to a vital fact issue. *See Steves Sash*, 751 S.W.2d at 477; *Lyon*, 2017 WL 4545831, at *7; *Daniels*, 368 S.W.3d at 748–49. And although La Michoacana Meat Market did file a motion for JNOV, it strictly related to "the jury['s] award of future medical expenses" and did not contain the legal-sufficiency complaints that it now advances on appeal. *See Steves Sash*, 751 S.W.2d at 477; *Lyon*, 2017 WL 4545831, at *7; *Daniels*, 368 S.W.3d at 748–49.

Further, we note that La Michoacana Meat Market filed two motions for new trial, but neither of them raised its legal-sufficiency complaints. *See Lowry v. Tarbox*, 537 S.W.3d 599, 608–09 (Tex. App.—San Antonio 2017, pet. denied) (although defendant filed new-trial motion, motion did not raise specific sufficiency challenge advanced on appeal and complaint waived); *Halim v. Ramchandani*, 203 S.W.3d 482, 487 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (no error preserved where arguments in motion for new trial differed from legal-sufficiency argument made on appeal). And although La Michoacana Meat Market argued in its amended motion for new trial that "[t]he jury's finding that [it] failed to provide an adequate warning to [Santibanez] is not supported by legally sufficient evidence" because "the two caution[] and warning [signs] provided to their customers concerning the presence of [a] spilled substance on the floor of the store discharged the duty it owed" to Santibanez, it filed its amended motion more than thirty days

22

after the trial court had signed its final judgment, and it, therefore, was untimely.[3] *See* TEX. R. CIV. P. 329b(b); *Low v. Henry*, 221 S.W.3d 609, 619 (Tex. 2007); *Moritz v. Preiss*, 121 S.W.3d 715, 720 (Tex. 2003). "[A]n untimely amended motion for new trial does not preserve issues for appellate review." *Moritz*, 121 S.W.3d at 720–21; *see also Thomas v. Ginter*, No. 01-13-00143-CV, 2014 WL 3738054, at *4 (Tex. App.—Houston [1st Dist.] July 29, 2014, no pet.) (mem. op.).

Because La Michoacana Meat Market did not raise its legal-sufficiency complaints through a motion for directed verdict, an objection to the submission of the issue to the jury, a motion to disregard the jury's answer to a vital fact issue, its motion for JNOV, or a timely motion for new trial, we hold that it has not preserved its legal-sufficiency complaints for appellate review. *See Steves Sash*, 751 S.W.2d at 477; *Lyon*, 2017 WL 4545831, at *7; *Daniels*, 368 S.W.3d at 748–49; *see also Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 604 (Tex. 2012) (appellate court may not consider unpreserved or waived issue); *Garden Ridge, L.P. v. Clear Lake Ctr., L.P.*, 504 S.W.3d 428, 435 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("The core principle underlying error-preservation requirements is that the trial court should be given the opportunity to correct potential errors before the case proceeds on appeal" (internal quotations omitted)).

---

[3] The trial court signed its final judgment on June 20, 2016. La Michoacana Meat Market filed its amended motion for new trial on August 18, 2016.

## Judgment Notwithstanding the Verdict

In his sole cross-point, Santibanez argues that the trial court erred in granting La Michoacana Meat Market a JNOV on the ground that no evidence supports the jury's award of $120,000 in future medical expenses because "legally sufficient evidence supports the jury's verdict of $120,000 in future medical expenses."

A trial court may disregard a jury's verdict and render a JNOV if there is no evidence to support the jury's findings or if a directed verdict would have been proper. TEX. R. CIV. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 15 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We review a challenge to a trial court's ruling on a motion for JNOV under a legal-sufficiency standard. *City of Keller*, 168 S.W.3d at 823 ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review."). We will uphold a trial court's JNOV based on "no evidence" when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the trial court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810.

"If more than a scintilla of evidence supports the jury's finding[], the jury's verdict[,] and not the trial court's judgment[,] must be upheld." *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003); *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). In determining whether more than a scintilla of evidence exists, we review only the evidence supporting the jury's verdict and disregard all evidence and inferences to the contrary. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227–28 (Tex. 1990). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted). Evidence that is "so weak as to do no more than create a mere surmise," however, is no more than a scintilla and, thus, no evidence. *Id.* (internal quotations omitted).

To recover future medical expenses, a plaintiff must present evidence to establish that in all reasonable probability future medical care will be required and the reasonable cost of that care. *Finley v. P.G.*, 428 S.W.3d 229, 233 (Tex. App.—Houston [1st Dist.] 2014, no pet.). The jury may determine reasonable probability by considering "the substance of the testimony . . . and . . . not . . . on semantics or the use by [a] witness of any particular term or phrase." *Ins. Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966); *see also Robinson v. Garcia*, No.

25

11-12-00295-CV, 2016 WL 1725297, at *3 (Tex. App.—Eastland Apr. 29, 2016, pet. denied) (mem. op.). A plaintiff is not required to establish the cost of future medical care through expert testimony or with absolute certainty. *Finley*, 428 S.W.3d at 233; *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 426 (Tex. App.—Eastland 2006, no pet.); *Whole Foods Mkt. Sw., L.P. v. Tijerina*, 979 S.W.2d 768, 781 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). In fact, no precise evidence is required. *Finley*, 428 S.W.3d at 233; *Snyder*, 191 S.W.3d at 426.

Generally, "the award of future medical expenses rests within the sound discretion of the jury." *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *see also Whole Foods Mkt.*, 979 S.W.2d at 781. And the jury can make its determination of the amount of future medical expenses and care based on the injuries suffered by the plaintiff, the medical care rendered before trial, the progress toward recovery under the treatment received, and the condition of the injured party at the time of trial. *Finley*, 428 S.W.3d at 233; *Rosenboom Mach. & Tool*, 995 S.W.2d at 828; *see also Whole Foods Mkt.*, 979 S.W.2d at 781 ("The reasonable value of future medical care may be established by evidence of the reasonable value of past medical treatment."). Appellate courts are hesitant to disturb a fact-finder's conclusion regarding an award of future medical expenses. *Finley*, 428 S.W.3d at 234; *see also Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied) ("Because issues

26

such as life expectancy, medical advances, and the future costs of products and services are, by their very nature, uncertain, appellate courts are particularly reluctant to disturb a jury's award of these damages." (internal footnote omitted)).

At trial, Santibanez testified that when he slipped and fell on the pork lard at La Michoacana Meat Market, he hit his face, knees, and back "very hard," and he "twisted [a]round," "very badly," injuring his back. After falling, Santibanez felt pain in his lower back, his nose swelled, his knees hurt, and he felt "dizzy." The day after his fall, he went to a clinic belonging to La Michoacana Meat Market because he was in "severe pain." The doctor at the clinic told him that he had "swelling in [his] lower back" and sent him to the emergency room at the Bayshore Medical Center. There, Santibanez's primary complaint was lower back pain. A doctor, diagnosing him with muscle strain, related to his back, and contusions, prescribed medication for him and recommended that he follow-up with an orthopedic surgeon within forty-eight hours.

Santibanez subsequently went to Southeast Chiropractic Center, where he received physical therapy, which helped lessen his back pain, but did not eliminate it completely. He received chiropractic treatment for approximately five months, attending approximately thirty appointments, but he did not feel "healed" at the end of his treatment time. At the conclusion of his treatment, the doctor at Southeast Chiropractic Clinic concluded:

Due to the severity of [his] injuries, his prognosis is guarded. [His] injuries are subject to episodes of remission and exacerbation by various aggravations from activities of daily living and times of stress. It is likely that [he] may experience future episodes of pain and weakness as a result of [his] residual unresolved injuries . . . . [Santibanez] is advised to seek continued care with an orthopedic specialist if symptoms continue to worsen. Future treatment is indicated on an as needed basis to help pain experienced from aggravations caused by [his] performance of his activities of daily living.

In addition to the treatment that he received at the Southeast Chiropractic Center, Santibanez, at Memorial MRI & Diagnostic, had MRIs made of his lower back and both knees. According to Santibanez, the MRI of his lower back showed that his "lower discs are injured about 5 centimeters, each one," and the MRIs of his knees showed inflammation and "spread -- liquid."

Santibanez further saw an orthopedic surgeon, Dr. Sanders, who "gave [him] tablets for the pain" and a "recommendation of what [he] needed to [do to] fix the problem [in his] back." And he saw Dr. Rodriguez, an orthopedic specialist, who concluded that he had "developed back, knee and foot pain, associated with headaches" after his fall at La Michoacana Meat Market. Rodriguez advised Santibanez to seek a "neurological evaluation for [his] headaches and memory issues" and continue to participate in physical therapy. Further, both Rodriguez and the doctor at the Southeast Chiropractic Clinic "recommended ongoing care for [Santibanez] based on [his] pain, [his] symptoms, and [his] memory issues from [his] head injury." As of trial, Santibanez had not seen a neurologist.

28

In regard to his medical expenses, Santibanez testified that he received bills from Bayshore Medical Center for $2,817, Spencer Highway Emergency Room Physicians for $1,593, Southeast Chiropractic Center for $5,526, Dr. Sanders for $1,000, Memorial MRI & Diagnostic for $7,875, and Dr. Rodriguez for $525. And the total amount of his past medical expenses was $19,396. Further, Santibanez opined that if he were to continue treatment at the Southeast Chiropractic Center and with Rodriguez, he would expect the cost to be similar to what he has been charged in the past.

Santibanez also testified that since his fall, he is always in pain, "[s]ometimes it's strong, and sometimes it's weaker," but it is "always there." And he described his pain, at the time of trial, as "very bad" and "terrible." The pain in his back causes pain in his knee and in his foot. And if he stands for more than an hour or carries something heavy, he feels as if he is "standing on thorns." The pain has also caused Santibanez to become depressed, and hitting his head during his fall caused reoccurring headaches, which began two or three days after his fall, and "memory issues." In order to manage his pain, he takes "over-the-counter pain medication" every day and "us[es] a home heating pad" and a "massage sofa." He does not believe that the pain that he feels will ever go away. And he opined that his injuries have gotten worse over time.

The record also contains an extensive amount of Santibanez's medical records. For instance, his records from Bayshore Medical Center state that, the day after his fall, he complained at the hospital of "lower back pain, upper back pain[,] and bilateral knee pain." A doctor diagnosed him with "[m]uscle strain" and "[c]ontusion of [the] back" and prescribed medication. In regard to his injuries, the medical records more specifically state that Santibanez had "a strained muscle," i.e., "a stretching and tearing of muscle fibers," which "cause[d] pain, especially with motion of th[e] muscle," and "swelling and bruising." He also had a "deep bruise (contusion)," i.e., an "area of tenderness and swelling in the soft tissues," which was the "result of trauma and bleeding in the injured area." The doctor recommended that Santibanez "follow up" with an orthopedic surgeon within two days. Bills from Bayshore Medical Center and Spencer Highway Emergency Room Physicians show that the cost of Santibanez's treatment was $2,817 and $1,593, respectively.

In regard to the Southeast Chiropractic Center, Santibanez's medical records show that he sought treatment after "a slip and fall accident." And at the time he sought treatment, he complained of "headaches and pain in his neck, back, and both knees" and "numb tingling pain [which] travel[s] down both legs." The pain ranged from "constant moderate to [a] severe sharp sensation," was "made worse with movement and activity," and affected his ability to perform "tasks of daily living." An examination of Santibanez revealed tenderness and spasms in his back, a

restricted and painful range of motion related to his spine, and a decreased range of motion in both knees. Initially, the treatment recommended for him consisted of "specific chiropractic manipulation of the cervical, thoracic, and lumbar spine to correct the interosseus disrelationship with gentle mobilation maneuvers to restore the function and strength of weakened muscles," "[m]oist heat for the injured areas to relax [the] muscle-spasm and increase circulation," "[u]ltrasound and electrical muscle stimulation" to "facilitate healing of the damaged tissue and decrease muscle spasm and pain," "Biofreeze gel" for pain relief, and "[i]ntersegmental traction" "to restore . . . function and strength of weakened muscles" and to "decrease spasm and pain."

According to the Southeast Chiropractic Center records, Santibanez received treatment there for five months, attended twenty-four appointments, and received some pain relief with treatment. In addition to the above treatment, he also participated in "a progressive rehabilitation exercise program" and "[i]nfared therapy." Despite having some pain relief, the records indicate that Santibanez still continued to experience "discomfort [in his] low back and both knees" while he was being treated. And he was "referred out for an MRI of the lumbar spine and both knees." Because of the "positive MRI findings, continued complaints[,] and symptomatology," Santibanez was "referred to an orthopedic specialist for consultation and evaluation." At the conclusion of his treatment, he was "released

31

to the care of an orthopedic specialist for future treatment and recommendations."

And the doctor at the Southeast Chiropractic Center concluded:

> Due to the severity of [his] injuries, his prognosis is guarded. [His] injuries are subject to episodes of remission and exacerbation by various aggravations from activities of daily living and times of stress. It is likely that [he] may experience future episodes of pain and weakness as a result of [his] residual unresolved injuries . . . . [Santibanez] is advised to seek continued care with an orthopedic specialist if symptoms continue to worsen. Future treatment is indicated on an as needed basis to help pain experienced from aggravations caused by [his] performance of his activities of daily living.

A bill from Southeast Chiropractic Center shows that the cost of Santibanez's treatment was $5,526.

In regard to Dr. Sanders, an orthopedic surgeon at the Sanders Clinic for Orthopedic Surgery and Sports Medicine, Santibanez's medical records indicate that he sought treatment because of "back and knee" injuries and was prescribed pain medication. Santibanez testified at trial that the "New Patient Information Sheet," which he completed in Spanish, stated: "I went to the store, to the area of the produce. There was lard on the floor. I slipped. I hit my head, my knees, and my back very hard; and I was -- and I remained a bit dizzy for a few minutes." A bill from Sanders shows the cost of the "[n]ew [p]atient [c]onsult" was $1,000.

In regard to Dr. Rodriguez, an orthopedic specialist, Santibanez's medical records reveal that he saw Rodriguez because of lower back pain or discomfort, neck pain or discomfort, knee problems, and feet problems. And Santibanez "present[ed]

32

with foot and knee pain of both inferior extremities" and "recurrent headaches that began after . . . [he] slipped and fell." His "daily" headaches were "associated with forgetfulness," his "bilateral heel pain . . . increases with standing activities," and "[t]he pain in his knees and feet decreases when sitting or resting." At the time of treatment, he rated his pain levels as seven or eight out of ten, and Rodriguez noted that he "ha[d] been going to PT with no improvement." According to Rodriguez's assessment, Santibanez "developed back, knee and foot pain, associated with headaches after . . . [his] fall." Rodriguez recommended that Santibanez receive physical therapy for range of motion, engage in strengthening exercises, and seek a neurological evaluation for his headaches and "memory issues." And Rodriguez prescribed an anti-inflammatory medication for Santibanez to take daily. A bill from Rodriguez shows that the cost of Santibanez's treatment was $525.

In regard to Memorial MRI & Diagnostic, Santibanez's medical records show the following results from his lumbar spine MRI:

> At L3-L4, diffuse posterior bulging disc is seen measuring 1.8-2 mm in AP diameter, touching the thecal sac.
>
> At L4-L5, there is central posterior protusion-subligamentous disc herniation measuring 2.4 mm in AP diameter, flattening the thecal sac.
>
> At L5-S1, there is moderate posterior protusion-subligamentous disc herniation in the central and lateral aspect in both sides . . . measuring 5.3 mm in AP diameter, not reaching the thecal sac. There is a tear in the posterior annulus fibrosus in the left pancentral region. Hypertrophic changes are noted in the facet joints.

33

And the MRIs of Santibanez's knees showed "[s]light joint effusion," but no evidence of a "meniscal tear, ligament tear, or tendon tear." A bill from Memorial MRI & Diagnostic show that the cost of his MRIs was $7,875.

Although there is evidence to show that in all reasonable probability Santibanez will require some medical care in the future, the evidence of the actual cost of such future medical care is minimal at best. Regarding the cost of his future medical care, the only evidence in the record is Santibanez's testimony as to the cost of his past medical care, which totaled $19,396, and his opinion that if he were to continue treatment at the Southeast Chiropractic Center or with Dr. Rodriguez, which he was not at the time of trial, he would expect the costs to be similar to what he had been previously charged in regard to those two specific health care providers.[4] But neither Santibanez's testimony nor any other evidence in the record can support the jury's award of $120,000 of future medical expenses. *See Rosenboom Mach.*, 995 S.W.2d at 828 (insufficient evidence supported jury's award of $10,000 for future medical expenses where no testimony established cost of future medical care).

In *Rosenboom Machine*, this Court previously dealt with the issue of whether there was legally-sufficient evidence to support the jury's award of $10,000 of future medical expenses to Josephine Machala after a fall. *Id.* at 819, 828. There, we

---

[4] Santibanez's treatment at the Southeast Chiropractic Center cost $5,526 and his treatment with Dr. Rodriguez cost $525.

34

explained that "in making its award of damages for future medical expenses, the jury had the right to consider":  (1) testimony from Machala's doctor that she suffered a fractured vertebrae which required immediate hospitalization; (2) testimony from her daughter-in-law that she stayed in the hospital for three to four weeks after her fall; (3) testimony from Machala, her son, and daughter-in-law regarding the pain that she had suffered because of her fall; (4) testimony regarding the medical treatment that she had received; (5) the parties' stipulation that she had "incurred reasonable and necessary medical expenses of $9,596.04"; and (6) her testimony that at the time of trial she still experienced back pain.  *Id.* at 828.  However, we noted that Machala had not provided any testimony or evidence "establishing that in all reasonable probability that [she] would require future medical care and *the cost of such care*."  *Id.*  (emphasis added).  And we held that without such evidence, the evidence noted above was legally insufficient to support the jury's award of $10,000 for future medical expenses.  *Id.*; *see also Pilgrim's Pride Corp. v. Mansfield*, No. 09-13-00518-CV, 2015 WL 794908, at *9–10 (Tex. App.—Beaumont Feb. 26, 2015, no pet.) (mem. op.) (although evidence showed plaintiff probably will need additional pain medication and will incur additional expense for her physical therapy treatments, evidence not sufficiently developed to establish plaintiff would incur "an additional $50,000" in future medical expenses); *Roth v. Law*, 579 S.W.2d 949, 956 (Tex. App.—Corpus Christi 1979, writ ref'd n.r.e.); *cf. Finley*, 428 S.W.3d at 234–

35

35 (evidence sufficient to support jury's award of future medical expenses where counselor testified to cost of counseling sessions, need for weekly sessions to continue indefinitely, and condition could not be cured; evidence at trial also included evidence of injuries, condition at trial, persistent decline in well-being, age, life expectancy, and billing records).

Here, as in *Rosenboom Machine*, there is no evidence to support the jury's award of $120,000 of future medical expenses to Santibanez. And on appeal, Santibanez does not make any argument to justify any other amount of future medical expenses; he only asks this Court to "reverse the JNOV ruling of the trial court and render judgment based on the jury verdict in the amount of $200,000," which included the jury's award of $120,000 for future medical expenses.[5] Further, we note that La Michoacana Meat Market does not challenge the trial court's award of $20,000 to Santibanez for future medical expenses. Accordingly, we hold that the trial court did not err in granting La Michoacana Meat Market a JNOV on the ground that no evidence supported the jury's award of $120,000 in future medical expenses. *See* TEX. R. CIV. P. 301; *Tiller*, 121 S.W.3d at 713; *B & W Supply*, 305 S.W.3d at 15.

We overrule Santibanez's sole cross-point.

---

[5] In the trial court, Santibanez also only argued that the evidence supported the jury's award for $120,000 in future medical expenses; he supported no other possible amount of future medical expenses.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Caughey.